**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JANE ROLLINSON and DANIEL GREGORIE<br><br>Plaintiffs,<br><br>v.<br><br>BRIGHTON MARINE, INC. (f/k/a BRIGHTON MARINE HEALTH CENTER, INC.), CHRISTUS HEALTH (d/b/a CHRISTUS HEALTH SERVICES), THE JOHNS HOPKINS MEDICAL SERVICES CORPORATION, MARTIN'S POINT HEALTH CARE, INC. (d/b/a MARTIN'S POINT HEALTH CARE CENTER), PACMED CLINICS (d/b/a PACIFIC MEDICAL CENTER), SAINT VINCENTS CATHOLIC MEDICAL CENTERS OF NEW YORK, and US FAMILY HEALTH PLAN ALLIANCE, LLC<br><br>Defendants. | Civil Case No.: 2:16-cv-00447-NT<br><br>JUDGE TORRESEN<br><br>**JURY TRIAL DEMANDED** |

**UNITED STATES' COMPLAINT IN INTERVENTION**

# TABLE OF CONTENTS

**I. INTRODUCTION** .......... **1**

**II. JURISDICTION AND VENUE** .......... **3**

**III. PARTIES** .......... **4**

**IV. LEGAL FRAMEWORK** .......... **7**

A. The False Claims Act .......... 7

B. The National Defense Authorization Act of 1997 .......... 8

**V. FACTUAL ALLEGATIONS** .......... **11**

A. The USFHP Program .......... 11

i. 2008-2013 USFHP Contracts .......... 11

ii. Individuals and Entities Involved in the USFHP Program .......... 12

iii. The Legal Requirements Governing the Rates .......... 15

iv. The Annual Rate Setting Process .......... 17

B. The Health Status Adjustments (HSAs) Were a Key Component of the Ceiling Rates. .......... 20

i. Medicare's Method of Measuring Health Status .......... 21

ii. The Calculation of the HSA .......... 22

C. The HSAs Used to Develop the Base Period, OP1, OP2, and OP3 Ceiling Rates Were Infected by Two Errors. .......... 24

i. The Filtering Error .......... 26

ii. The Prospective Error .......... 27

iii. The Significance of the Two Errors .......... 29

D. Defendants Eventually Learned of the Two Errors (But TMA Did Not). .......... 31

i. Rates Paid in 2008-2012: As a Result of the HSA Errors, the Plans Had Been Earning [redacted] Profit Margins on the USFHP Program for Years. .......... 31

ii. Rate Discussions in 2011: The Switch to the TFL Methodology Was First Attempted. .......... 33

iii. Rate Discussions Begin in 2012: The TFL Methodology Was Actually Implemented and the HSA Errors Were Discovered. .......... 35

iv. Rate Discussions Continued Throughout 2012: Defendants Were Informed of the Errors. .......... 37

E. By June 2012, Defendants Knew the HSA Errors Impacted the Base Period, OP1, OP2, and OP3 Rates and Caused the DPs To Be Overpaid in Those Periods. .......... 43

i. Milliman Provided the Plans with a Detailed Analysis of the HSA Errors. .......... 43

ii. The Plans Received Additional Information Indicating That the HSA Errors Had Inflated the OP3 Rates. 46

iii. Internal Communications within the Plans Show That They Understood the Erroneous HSAs Caused Them to Be Overpaid in OP3 and Earlier Periods. 48

F. TMA Did Not Become Aware of the Historic HSA Errors or Their Impact Until This *Qui Tam* Lawsuit Was Filed. 51

i. Defendants Had Several Opportunities to Inform TMA of the Historic HSA Errors, Their Impact, or the Resulting Overpayments, But They Never Did. 51

ii. Kennell, TMA's Actuarial Consultant, Also Did Not Tell TMA About the Historic HSA Errors, Their Impact, or the Resulting Overpayments. 66

iii. At No Point Prior to the Filing of this *Qui Tam* Did TMA Know About (Or Even Suspect) That the HSA Errors Had Impacted Past Rates and Resulted in Overpayments. 71

iv. Defendants Were Acutely Aware of TMA's Ignorance and Took Steps to Maintain It. 74

G. Had TMA Been Aware of the HSA Errors and Their Impact, TMA Would Not Have Paid the Plans at the Improperly Inflated Ceiling Rates and Would Have Taken Steps to Recoup Any Overpayments. 78

i. TMA Was Not Legally Permitted to Pay Rates That Violated the USFHP Program's Governing Statute and Would Not Have Paid Rates That Violated the Health Comparison Requirement. 79

ii. When TMA Had Knowledge of Other Errors or Violations of Material Requirements, It Took Action to Remedy Them. 80

H. The Plans Retained Overpayments and Submitted False Claims. 84

i. The Plans Retained Overpayments 84

ii. The Plans Submitted False Claims 85

**VI. CAUSES OF ACTION 87**

1. Plaintiff, the United States of America (United States) files this complaint-in-intervention under the False Claims Act (FCA), 31 U.S.C. § 3729, *et seq.*, and the common law, against defendants Brighton Marine, Inc. (formerly known as Brighton Marine Health Center, Inc.), CHRISTUS Health (d/b/a CHRISTUS Health Services), The Johns Hopkins Medical Services Corporation, Martin's Point Health Care, Inc. (d/b/a Martin's Point Health Care Center), PacMed Clinics (d/b/a Pacific Medical Center), and Saint Vincents Catholic Medical Centers of New York (collectively, the Designated Providers, DPs, or Plans) and the US Family Health Plan Alliance, LLC (individually, the Alliance). The Alliance and the six Plans will be referred to collectively as Defendants.

## I. INTRODUCTION

2. The government program at issue here is unique and complex, but the alleged fraud is not. Between 2008 and 2012, the Department of Defense (DOD) inadvertently overpaid six private health plans that had contracted to provide health coverage to military families. Prior to June 2012, those six Plans knew they were being paid highly lucrative rates for providing coverage for individuals aged 65 and older enrolled in the program, but they did not fully understand why those rates were so lucrative. However, in June 2012, the Plans realized they had been overpaid as a result of two errors that had improperly inflated their payment rates for these individuals. The government never had the same realization. The Plans failed to report or return any of those overpayments and, in fact, continued submitting claims to the government at the improperly inflated rates for several more months. Based on an assessment of the errors' impact by the Plans' own actuary, the Plans were collectively overpaid by over $300 million between 2008 and 2012.

3. The government program at issue is called the Uniformed Services Family Health Plan (USFHP). Through this program, DOD contracts with certain private health plans to provide healthcare services to military personnel, retirees, and their families. There are currently only six health plans in the country—called the Designated Providers, DPs, or Plans—that can offer the USFHP benefit: Brighton Marine, Christus, Johns Hopkins, Martin's Point, PacMed, and St. Vincent's.

4. The statute that authorizes the USFHP program contains an express limitation on payments. Specifically, the government cannot pay the Plans more than the government would have paid if the USFHP enrollees had received health care from other government programs (i.e., through a military treatment facility, TRICARE, or Medicare).

5. In its contracts with the Plans, DOD agreed to pay the Plans a capitation payment (which is a flat fee) for each beneficiary enrolled in the program. Those capitation payments were not permitted to exceed the statutory payment limitations.

6. Before 2012, an actuarial firm retained by DOD consistently made two errors when calculating the statutory payment limitations for USFHP beneficiaries who were 65 years old or over. As a result of these two errors, the statutory limits the actuaries calculated were significantly higher than they would have been had the limits been calculated correctly and those statutory limits were not calculated in an actuarially sound manner. These errors resulted in each Plan being overpaid by million of dollars each year.

7. Between 2008 and 2012, no one recognized that these two errors were being made or that the Plans were being paid at rates that exceeded the statutory limits for the 65 and over beneficiaries.

8. In 2012, DOD's actuaries and Defendants uncovered those two costly mistakes

and realized that both errors had been made in prior years. However, neither Defendants nor the DOD's actuaries ever told the government about these historic errors or overpayments. Consequently, the government was not aware of the need to take any action to recover funds that had been improperly paid to the Plans until the *qui tam* complaint in this case was filed.

9. The United States now brings this action to recover those funds. The United States seeks to recover treble damages and civil penalties arising from violations of the FCA and to recover damages and other monetary relief under the common law theories of breach of contract, unjust enrichment, and payment by mistake.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(a) and 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this action is brought by the United States as a plaintiff pursuant to the FCA.

11. This Court may exercise personal jurisdiction over all Defendants pursuant to 31 U.S.C. § 3732(a). The Court may exercise personal jurisdiction over all Defendants because at least one Defendant, Martin's Point, transacts business in this District and committed some of the actions described herein, which are proscribed by 31 U.S.C. § 3729, in this District.

12. Similarly, venue is proper in this jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and 1395(a). Venue is proper in this jurisdiction because a substantial part of the events or omissions giving rise to these claims occurred in Maine, by virtue of the actions taken by Defendant Martin's Point. Additionally, all Defendants are subject to the Court's personal jurisdiction pursuant to 31 U.S.C. § 3732(a).

## III. PARTIES

13. The Plaintiff in this action is the United States, suing on behalf of the Defense Health Agency (DHA), which is part of the United States Department of Defense. Among other things, DHA enables a global network of military and civilian health care professionals to provide care to over nine million service members, retirees, and family members. During the time period at issue in this matter, the TRICARE Management Activity (TMA), a DOD field activity, administered and supervised the USFHP program. On October 1, 2013, TMA functions were transferred to DHA. This complaint will use the term TMA to refer to the former TMA and the current DHA.

14. Defendant Brighton Marine, Inc. ("Brighton Marine") is a nonprofit corporation incorporated in the Commonwealth of Massachusetts. From 1997 to 2019, Brighton Marine, Inc. was known as Brighton Marine Health Center, Inc. Brighton Marine is a Designated Provider in the USFHP program and serves USFHP members in Massachusetts, Rhode Island, Connecticut, and New Hampshire.

15. In 2008, Brighton Marine entered into an exclusive Master Services Agreement with Caritas St. Elizabeth's Medical Center of Boston, which was acquired by Steward Health Care System, LLC in 2010 (Steward Health Care System, LLC and its predecessors will collectively be referred to herein as "Steward"). Under that agreement, Steward would perform all of Brighton Marine's obligations under its USFHP Contract with TMA and would administer the USFHP plan on Brighton Marine's behalf in accordance with the terms of Brighton Marine's contract with TMA and all applicable laws and regulations. Throughout the relevant time period, when Steward employees took action with respect to the USFHP program, they were acting on behalf of Brighton Marine and held themselves out as representatives of Brighton Marine.

Steward's employees also regularly reported to Brighton Marine's leadership significant developments with respect to the USFHP rates. Consequently, all of the actions taken by Steward employees working on the USFHP program can be imputed to Brighton Marine.

16. Defendant CHRISTUS Health, doing business as CHRISTUS Health Services, ("Christus") is a nonprofit corporation incorporated in the State of Texas. Christus is a Designated Provider of USFHP services and serves USFHP members in Texas and Louisiana.

17. Defendant The Johns Hopkins Medical Services Corporation ("Johns Hopkins") is a nonprofit corporation incorporated in the State of Maryland. Johns Hopkins is a Designated Provider of USFHP services and serves USFHP members in Maryland, Delaware, Pennsylvania, Virginia, West Virginia, and the District of Columbia. The Johns Hopkins Medical Services Corporation is a part of the Johns Hopkins Health System Corporation, which in turn has collaborations with the Johns Hopkins University School of Medicine. This collaboration is known as Johns Hopkins Medicine.

18. Defendant Martin's Point Health Care, Inc., doing business as Martin's Point Health Care Center, ("Martin's Point") is a nonprofit corporation incorporated in the State of Maine. Martin's Point is a Designated Provider of USFHP services and serves USFHP members in Maine, New Hampshire, Vermont, New York, and Pennsylvania. Martin's Point owns and operates five healthcare centers in the State of Maine, and its corporate headquarters are located in Portland, Maine. Martin's Point regularly conducts business and provides healthcare services throughout the State of Maine. Martin's Point sometimes is referred to as "MPHC."

19. Defendant PacMed Clinics, doing business as Pacific Medical Center (or Pacific Medical Centers), ("PacMed") is a nonprofit corporation incorporated in the State of

Washington. PacMed is a Designated Provider of USFHP services and serves USFHP members in Washington, Idaho, Oregon, and California.

20. Defendant Saint Vincents Catholic Medical Centers of New York ("St. Vincent's") is a nonprofit corporation incorporated in the State of New York. St. Vincent's is a Designated Provider of USFHP services and serves USFHP members in New Jersey, Connecticut, and New York.

21. Defendant US Family Health Plan Alliance, LLC (the "Alliance") is a limited liability corporation incorporated in the State of Delaware that acts to advance the collective interests of the Designated Providers. The Alliance is governed by a Board (the "Alliance Board") comprised of members affiliated with and authorized to act on behalf of each Designated Provider. The Alliance has several committees that conduct Alliance business, including a Finance Committee (the "Finance Committee"). The Finance Committee is comprised of members affiliated with each Designated Provider and its activities include participating in the Designated Providers' USFHP rate discussions with TMA.

22. Relator Jane Rollinson is a resident of the State of Florida. From 2007 to 2015, Rollinson worked with Martin's Point, including serving as its Interim Chief Financial Officer from October 2011 to February 2013. On August 30, 2016, Rollinson, jointly with relator Daniel Gregorie, filed this action under the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1), alleging violations of the FCA on behalf of the United States.

23. Relator Daniel Gregorie is a resident of the State of Florida. From 2000 to 2003, Gregorie was a consultant to the CEO and Board of Martin's Point, and from 2003 to 2008 he served on the Martin's Point Healthcare Centers Board of Trustees. On August 30, 2016,

Gregorie, jointly with Rollinson, filed this action under the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1), alleging violations of the FCA on behalf of the United States.

## IV. LEGAL FRAMEWORK

### A. The False Claims Act

24. The False Claims Act, 31 U.S.C. §§ 3729-33, is the United States' primary litigative tool for combatting fraud, waste, and abuse and for protecting taxpayer funds. As the Supreme Court has explained, the FCA broadly creates liability for "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

25. The FCA provides, in pertinent part, that a "person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of subparagraph (A), (B), . . . or (G); [or]

* * *

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1) (2010).

26. Under the FCA, the term "knowingly" means that a person (i) "has actual knowledge of the information," (ii) "acts in deliberate ignorance of the truth or falsity of the information," or (iii) "acts in reckless disregard of the truth or falsity of the information." *Id.*

§ 3729(b)(1)(A). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.* § 3729(b)(1)(B).

27. The FCA defines "obligation" to mean an "established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, . . . from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3).

28. The FCA states that "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4).

29. The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of between $5,500 and $11,000. *Id.* § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

**B. The National Defense Authorization Act of 1997**

30. The Department of Defense, via TMA, delivers health care to both active-duty and retired military service members and their families. In some cases, TMA contracts with private health insurance plans to provide health care benefits to TRICARE beneficiaries.

31. USFHP is one of the managed care health plans available to certain TRICARE beneficiaries. USFHP is authorized and governed by the National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201 § 721 *et seq.*, 110 Stat. 2422 (1996) (NDAA), as amended, reprinted in the notes of 10 U.S.C.A. § 1073.

32. The NDAA states that "the Secretary of Defense shall negotiate and enter into an agreement with each designated provider under which the designated provider will provide health care services in or through managed care plans to cover beneficiaries who enroll with the designated provider." Pub. L. No. 104-201 § 722(b), 110 Stat. 2422 (1996).

33. Each month, TMA makes a capitation payment to each Designated Provider for each of the beneficiaries enrolled with that DP. For purposes of this case, there are three material requirements necessary to ensure the capitation payments made to the Designated Providers were legally valid (discussed more fully below). First, the NDAA requires the payments be within the statutory limit. Second, the NDAA requires the payments be actuarially sound. Third, the contract requires the payments be derived using an appropriate health comparison. These three requirements will be collectively referred to as "the material requirements."

34. Section 726(b) of the NDAA imposes a limitation on the payments that the government can make to the Designated Providers participating in the USFHP program. Section 726(b) provides that "[t]otal capitation payments for health care services to a designated provider shall not exceed an amount equal to the cost that would have been incurred by the Government if the enrollees had received such health care services through a military treatment facility, the TRICARE program, or the Medicare program, as the case may be." Pub. L. No. 104-201 § 726(b); 110 Stat. 2422 (1996) (hereinafter Section 726(b)). The first material requirement—that capitation payments not exceed the limitation set forth in Section 726(b)—will be referred to herein as the "statutory limit."

35. Congress enacted Section 726(b) to address a concern that the Chief of Staff of a Subcommittee of the House Armed Services Committee raised about controlling costs. The Chief of Staff wanted to ensure that the government did not pay more for the USFHP program's beneficiaries than if those beneficiaries were enrolled in other government health care programs, such as Medicare or TRICARE.

36. Because Section 726(b) places an upper limit or "ceiling" on what TMA could pay the Designated Providers for beneficiaries' care, the term "ceiling rate" was used to refer to the amount that the government would have incurred had the USFHP enrollee received care from another government program. During the relevant period, the capitation payments that TMA made to the Designated Providers each month were set exactly at that calculated upper limit, or ceiling. Thus, in practice, the term "ceiling rate" or "rate," as used herein, is synonymous with the term "capitation payment."

37. The NDAA defines the term "capitation payment" to mean "an actuarially sound payment for a defined set of health care services that is established on a per enrollee per month basis." Pub. L. No. 104-201 § 721(3); 110 Stat. 2422 (1996). The NDAA also provides that capitation payments are "subject to periodic review for actuarial soundness and to adjustment for any adverse or favorable selection reasonably anticipated to result from the design of the program." Pub. L. No. 104-201 § 726(c); 110 Stat. 2422 (1996). The second material requirement—that the ceiling rates be actuarially sound—will be referred to herein as the "actuarial soundness requirement."

38. TMA and the Designated Providers each recognized that, at a minimum, actuarial soundness requires use of an appropriate methodology (i.e., one that is consistent with generally accepted actuarial principles) and accurate execution of that methodology. Each component of the methodology used to develop the amount of the ceiling rates had to be actuarially sound to comply with the statute's requirements. Additionally, to be actuarially sound, the calculations needed to be mathematically correct and any underlying member, claim, and other data input into a calculation needed to be accurate and sufficient for the stated purpose.

39. The contracts entered into between TMA and the DPs required that the methodology used to calculate the ceiling rates include a comparison of the health status of a DP's age 65 and over USFHP enrollees and the health status of the age 65 and over Medicare beneficiaries in that DP's service area using a particular model. *See* Section 9.2.2.3.e of each USFHP Contract. This third material requirement—discussed more fully in Section V.B.i., *infra*—will be referred to herein as the "health comparison requirement."

## V. FACTUAL ALLEGATIONS

### A. The USFHP Program

#### i. 2008-2013 USFHP Contracts

40. Historically, TMA would enter into a new USFHP contract with each of the Designated Providers once every five years. The contracts at issue here were signed in 2008 and ran from October 2008 to September 2013 (hereinafter the "USFHP Contracts").

41. A representative acting on behalf of each Designated Provider, authorized to bind that DP, signed that Designated Provider's USFHP Contract with TMA. By signing, each representative bound the entire Designated Provider to abide by the terms and conditions of the USFHP Contract.

42. Each USFHP contract incorporated a number of standard contract terms from the Federal Acquisition Regulation (FAR).

43. One FAR provision incorporated into the contracts provided that if the contractor learned it was overpaid, it was required to "immediately notify the Contracting Officer and request instructions for disposition of the overpayment." 48 C.F.R. § 52.212-4(i)(5) (Feb. 2007).

44. Another subsection of that same FAR provision stated that the contractor "shall only tender for acceptance those items that conform to the requirements of this contract." *Id.* § 52.212-4(a). "The Government may require . . . reperformance of nonconforming services at

no increase in contract price. If repair/replacement or reperformance will not correct the defects or it is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services." *Id.*

45. The five years covered by the USFHP Contracts were divided into a Base Period and four Option Periods (called OP1, OP2, OP3, and OP4). New ceiling rates were calculated for each of these periods, and those rates were memorialized in modifications to the USFHP Contracts.

46. The Base Period was co-extensive with TMA's fiscal year (FY) 2009 (October 1, 2008 to September 30, 2009). OP1 and OP2 were co-extensive with FY 2010 (October 1, 2009 to September 30, 2010) and FY 2011 (October 1, 2010 to September 30, 2011), respectively.

47. OP3 was originally intended to be co-extensive with FY 2012. But, as discussed in paragraph 231, *infra*, the OP3 rates were extended for two months. Therefore, OP3 ultimately ran from October 1, 2011 to November 30, 2012. The Base Period, OP1, OP2, and OP3 will collectively be referred to as "OP3 and earlier periods."

48. OP4 began on December 1, 2012 and continued through September 30, 2013.

49. Each month, each Designated Provider submitted an invoice to TMA on DD Form 250 in order to receive an "invoice payment" based on the established ceiling rates and the number of beneficiaries enrolled with that Plan. The invoice was then paid by TMA.

### ii. Individuals and Entities Involved in the USFHP Program

50. Two TMA employees had primary responsibility for the USFHP program: the Contracting Officer and the Program Manager.

51. The Contracting Officer for the USFHP program, or CO, was the government official with the authority to negotiate, execute, and modify the contracts that TMA entered into with each Designated Provider. In 2011 and 2012, the time period during which many of the

allegations described herein took place, the Contracting Officer for the USFHP program was Beatrice De Los Santos (Bea).

52. The Program Manager for the USFHP program was the individual responsible for the technical monitoring of the contract once it was executed and managing TMA's day-to-day relationship with the Designated Providers. For example, the Program Manager would ensure that TMA received necessary data about USFHP beneficiaries and paid the Designated Providers' invoices. Between 2010 and 2012, the Program Manager for the USFHP program (and also the Contracting Officer's Representative) was Danielle McCammon (Danielle).

53. The Designated Providers created a separate limited liability company called the "US Family Health Plan Alliance," or the "Alliance," to organize and coordinate the actions of the Designated Providers with respect to the USFHP program.

54. The Alliance had its own Executive Director and a number of committees. The Alliance's Finance Committee was charged with working on the annual recalculations of the ceiling rates on behalf of all Designated Providers. The Finance Committee was comprised of the Alliance's Executive Director and at least one representative acting on behalf of each Designated Provider.

55. Before the Finance Committee could take any action or pursue a particular course of conduct, its members needed to approve that action or course of conduct. Consequently, each action taken or substantive communication made by the Finance Committee was approved by at least one representative acting on behalf of each Designated Provider. Both the Alliance itself and the Designated Providers collectively acted through the Finance Committee.

56. The Plans and Alliance hired Steve Weiner (Steve), an attorney at the law firm Mintz Levin, to assist Defendants with the USFHP ceiling rate-setting process. Steve provided

both legal and business advice to the Alliance and its members and often served as the spokesperson for the Alliance when communicating with TMA.

57. Both the Designated Providers and TMA hired consultants to aid in the process of calculating the ceiling rates.

58. The Designated Providers hired actuaries at a firm called Milliman to assist them with the ceiling rate-setting process. Two Milliman actuaries—Tim Wilder (Tim) and Bob Cosway (Bob)—provided analyses and advice to the Finance Committee and its individual members during the ceiling rate calculation process.

59. Throughout 2012 when the ceiling rates were being discussed, the Finance Committee would meet regularly, at least bi-weekly and sometimes weekly, over the phone. Prior to each call, Tim typically would write a detailed email describing various observations he made and calculations he performed and he would have Steve distribute that email to the Finance Committee. Then, on the call, Tim typically would walk through each of the points raised in his email. During the call, the Executive Director of the Alliance would typically take notes. After the call, she would circulate proposed meeting minutes to the Finance Committee Chair and/or Steve for their review. Once any edits were made to those minutes, she would send the meeting minutes to the full Finance Committee. Thus, throughout 2012, each Finance Committee member would receive at least three communications with respect to each topic discussed at any particular committee meeting—one in advance of the meeting (in the form of Tim's pre-meeting email), one at the meeting itself (when Tim walked through his email), and one after the meeting (in the form of the meeting minutes).

60. DOD hired a firm called Kennell & Associates, Inc. (Kennell) to assist TMA with the USFHP ceiling rate-setting process, among other things. Two Kennell employees—Dave

Kennell (Dave) and Geof Hileman (Geof)—advised TMA about actuarial matters regarding the rate-setting process and calculated the ceiling rates.

61. When discussing actions taken by or statements made by Kennell and its employees, Defendants and Tim would often refer to those actions being taken by (or those statements being made by) "the government," "TMA," or "DOD." Kennell, however, was not a government entity, nor did it have the authority to bind the government. Whenever there is a basis to believe that a reference to "the government," "TMA," or "DOD," was actually meant to refer to Kennell, the term "Kennell" will be used herein.

**iii. The Legal Requirements Governing the Rates**

62. Section 726(c) of the NDAA and Section 9.4 of the USFHP Contracts required that the rates paid to each Designated Provider be recalculated annually. The process of recalculating the rates began early each spring. The new rates typically took effect on October 1.

63. There was not a single, uniform rate set for the entire program. Although the process used to determine the rates was largely consistent across the program, TMA set different rates for each Designated Provider to account for the differences in the cost of providing care in different locations in the country.

64. And for each Designated Provider, different rates were set based on the age and gender of the enrollee, to account for the differences in the cost of providing care to different demographic groups. In other words, there was one ceiling rate set for males 65-69 years old, a different ceiling rate set for females 65-69 years old, and another ceiling rate set for males 70-74 years old, and so on. (The process used to calculate and set rates for USFHP beneficiaries who were younger than age 65 are not at issue in this matter.)

65. Under both the statute and contracts, there were two possible methods for establishing these payment rates. First, under Section 726(a) of the NDAA and Section 9.1 of

each USFHP Contract, the Parties (i.e., TMA and the Designated Providers) were to negotiate capitation payments based upon, among other factors, the utilization experience of enrollees and competitive market rates (experience rates). To satisfy this requirement, each Plan developed and submitted a price proposal to TMA in 2008 that set forth its proposed experience rates and explained how those proposed rates were derived.

66. Second, under Section 726(b) of the NDAA and Section 9.2 of each USFHP Contract, the capitation payments could not exceed the costs the government would have incurred had Plans' enrollees received care under other enumerated government health care programs (i.e., the capitation payments had to comply with the statutory limit). To determine the "ceiling rates" that would yield payments at this statutory limit or "ceiling," the steps set forth in the remainder of Section 9.2 of the USFHP Contracts were to be followed.

67. Pursuant to Section 9.2, calculation of the ceiling rates started with a determination of the government's per capita costs of providing health care to a baseline beneficiary population (sometimes referred to as the "baseline costs"). The baseline costs reflected three components: the costs of Medicare-covered services, expenses related to Medicare cost-sharing (which TRICARE covered for its beneficiaries), and the cost of supplemental services that were not covered by Medicare, but were covered by TRICARE. The baseline costs were then adjusted by several factors. One of the most significant of these adjustments, described in Section 9.2.2.3.e of the USFHP Contracts, was known as the Health Status Adjustment or HSA, discussed below.

68. Section 9.3 then required that the experience rates and the ceiling rates be compared and that the rates that, in the aggregate, produced lower payments to the Plans be adopted. At all times relevant to this Complaint, the ceiling rates produced lower payments than

the experience rates, and thus the ceiling rates were the rates TMA paid to the DPs. As a result, almost all of the discussions between TMA and the DPs and their respective actuaries focused on the ceiling rates.

**iv. The Annual Rate Setting Process**

69. The ceiling rates for each period were determined in advance of the start of that period. As a result, to determine the ceiling rates, the actuaries had to develop and execute a methodology to predict what it would cost the government to provide care for the USFHP beneficiaries if they were enrolled in other government programs, and they had to do so in advance of knowing which individuals would be enrolled with each Plan or learning which health care services each individual would require.

70. Each year, Kennell & Associates would prepare an initial ceiling rate package for each DP and provide those packages to the Contracting Officer and/or Program Manager. Each package would contain a memo that described in detail the steps Kennell said it took to calculate the proposed ceiling rates. Each package also would contain related charts and tables showing some of Kennell's calculations and a final chart listing the rates. After the Contracting Officer and/or Program Manager reviewed the packages, the draft memos and charts were sent to the Plans.

71. Defendants would review these draft ceiling rate packages, with the assistance of Milliman. Discussions then would ensue between Kennell and TMA, on one side, and Milliman and Defendants, on the other. The discussions between the Parties would focus on the methodology used to develop each component of the ceiling rates. The goal of these discussions was to ensure the rates complied with each of the three material requirements discussed above.

72. Once receiving a draft rate package, Milliman tried to identify arguments the Defendants could make to TMA that the methodology should be changed in a way that would

result in higher rates overall for the DPs, but still comply with the material requirements. Milliman often would calculate the financial implications of each proposed change. Milliman would share its conclusions with Defendants, who would decide which issues to raise with TMA. As a result of Milliman's work, either Milliman, Steve, or the Alliance would submit a written response to TMA and propose suggestions on behalf of Defendants for revising the calculations.

73. Although the Defendants' ultimate goal was to increase the capitation rates they received, Defendants' proposals to TMA did not simply ask for an increase in rates without explanation. Instead, Defendants would couch proposed changes as necessary to comply with the material requirements. For example, they might explain that the stated methodology was not executed correctly or that a proposed change was necessary to correct an error that would otherwise result in payments that were not actuarially sound. Or they might justify a proposal by citing to a study or research paper or by making an actuarial argument to explain why the change was necessary to yield ceiling rates that reflected what the government otherwise would have paid to insure the Plans' enrollees. In proposing any changes, Defendants' focus was on the methodology and ensuring it complied with the actuarial soundness requirement and resulted in payments that complied with Section 726(b).

74. Kennell would then review those suggestions and make recommendations to TMA about whether it should accept or reject a particular suggestion. Kennell and TMA would take into consideration whether the suggestion would result in rates that were actuarially sound and complied with Section 726(b). Once Kennell conferred with TMA about which suggestions to accept, Kennell would revise the ceiling rate packages and/or HSA memos and send revised drafts to TMA. Those drafts would then be sent to the Plans. Milliman and Defendants would

continue to make suggestions, and Kennell and TMA would continue to review and respond to those suggestions.

75. After several rounds of revisions, the discussions would conclude, and the ceiling rates would be finalized. The Parties intended and understood that the rates they ultimately agreed to complied with the material requirements. The final ceiling rates for each Plan were incorporated into a modification to that Plan's USFHP Contract. Each contract modification was signed by the Contracting Officer and a representative acting on behalf of the relevant DP.

76. This process for determining the ceiling rates each year was the only mechanism the Parties used to ensure compliance with the statutory limit. At no point did the Parties engage in any process *after* a period ended to determine, retrospectively, what costs the government would have incurred if the individuals who were enrolled in the USFHP program during that period had instead received their health care services through the other government programs enumerated in Section 726(b).

77. The methodology and process used to determine the ceiling rates was so important to the Parties that, once it was finalized, the written memo detailing Kennell's process for determining the ceiling rates, and not just the table setting forth the numerical rates ostensibly resulting from that process, were incorporated into the contract modification.

78. TMA agreed to pay the DPs at the ceiling rates listed in the contract and subsequent modifications because TMA believed that (a) those rates were derived from a ceiling rate methodology that, if accurately executed, satisfied each of the material requirements and (b) such a ceiling rate methodology had, in fact, been accurately executed. If, before agreeing to pay the DPs at a set of numerical ceiling rates, TMA had known that the numerical rates were derived from a ceiling rate methodology that did not satisfy any one of the material requirements

or had known that the ceiling rate methodology had not been accurately executed, TMA would not have agreed to pay the DPs at those numerical rates.

### B. The Health Status Adjustments (HSAs) Were a Key Component of the Ceiling Rates.

79. There were several components used to calculate the ceiling rates. Between the Base Period and OP3, one of the most important components was the Health Status Adjustment or HSA. In these periods, the baseline costs and other components of a Designated Provider's ceiling rates were multiplied by that DP's HSA in order to derive that DP's final ceiling rate amounts.

80. The HSA was intended to compare the morbidity (or "sickness") of the universe of USFHP beneficiaries enrolled in each Designated Provider's service area to the morbidity (or "sickness") of a baseline population living in the same geographic location. The resulting HSA would indicate whether beneficiaries enrolled in USFHP were, on average, "sicker" or "healthier" than the baseline population and thus whether an average USFHP beneficiary was more or less costly to care for, as compared to an average member of the baseline population.

81. The Parties agreed that adjusting the baseline costs by an accurate HSA was an essential part of the ceiling rate methodology for OP3 and earlier periods and was a crucial mechanism used to comply with the statutory limit and the actuarial soundness requirement. To determine how much the government would have paid had the USFHP beneficiaries received care through a military treatment facility, TRICARE, or Medicare, the ceiling rate calculation had to account for whether the USFHP beneficiaries, because of their morbidity, were more or less costly to insure than the baseline population. For similar reasons, the HSA was necessary to ensure that rates were actuarially sound.

82. Indeed, the Parties' intent and understanding in Base Period through OP3 was that the HSAs would accurately compare the health status of a DP's age 65 and over USFHP enrollees and the health status of the age 65 and over Medicare beneficiaries in that DP's service area.

83. The use of an HSA and the way the Parties intended for it to be calculated were so significant that they were memorialized in each DP's contract with TMA. Section 9.2.2.3.e of each USFHP Contract, titled "Health Status Adjustment," stated that: "The Government will compare the health status of the DP enrollees age 65 and over with the health status of the 65 and over Medicare beneficiaries in the DP's service area. The Government will use Medicare's method of measuring health status unless the DP and the Government mutually agree to use a more appropriate method to measure health status. This health status adjustment will be used to adjust the ceiling rates for the 65 and over population. The Government reserves the right to recalculate this health status comparison in any year."

84. Additionally, for fiscal year 1998, the NDAA was amended to state that "[i]n establishing the ceiling rate for enrollees with the designated providers who are also eligible for [CHAMPUS], the Secretary of Defense shall take into account the health status of the enrollees." Pub. L. No. 105-85 § 723, 111 Sta. 1810 (1997). Individuals who are 65 years old and over, eligible for Medicare, and enrolled in Medicare Part B are eligible for CHAMPUS.

**i. Medicare's Method of Measuring Health Status**

85. The USFHP Contracts required use of "Medicare's method of measuring health status" when calculating the HSAs, unless there was an agreement to the contrary.

86. There was never such an agreement to the contrary. Accordingly, Medicare's method of measuring health status was to be used from the Base Period through OP4.

87. Medicare's method of measuring health status, the method used by the Centers for Medicare and Medicaid Services (CMS), was called the CMS-HCC risk adjustment model (referred to herein as the "CMS Model" or "model").

88. The CMS Model was publicly available online on the CMS website. There also was an instruction guide for the CMS Model available on the CMS website. This guide was called the "Risk Adjustment Data Technical Assistance for Medicare Advantage Organizations Participant Guide" or "RAPS Guide."

89. There are two inputs into the CMS Model: enrollment data and claims data. The enrollment data contains demographic data about the relevant beneficiaries, such as their age and gender. The claims data contains documentation of the beneficiaries' diagnoses and health conditions, as reported on claims submitted by the beneficiaries' health care providers.

90. When used correctly, the CMS Model produces a risk score, which is a numerical measure of the anticipated healthcare costs of an individual relative to the cost of an average Medicare beneficiary. The CMS Model is calibrated so that an individual predicted to have average healthcare costs has a score of 1.0. If a person has greater morbidity than average, and thus is expected to have higher-than-average healthcare costs, the CMS Model produces a risk score greater than 1.0. If a person has a lower morbidity than average, and thus is expected to have lower-than-average healthcare costs, the CMS Model produces a risk score less than 1.0.

**ii. The Calculation of the HSA**

91. The HSA was essentially a ratio or fraction made up of average risk scores. The numerator of the HSA was the average risk score for the USFHP beneficiaries enrolled with a

particular DP. The denominator of the HSA was the average risk score for the baseline population living in that DP's service area.

92. An HSA of 1.0 indicated that a DP's USFHP beneficiaries were on average just as sick as the baseline population and that no adjustment to the baseline costs was necessary based on health status. An HSA over 1.0 indicated that the USFHP beneficiaries were on average sicker than the baseline population and resulted in an upward adjustment of the baseline costs (and thus higher ceiling rates). An HSA under 1.0 indicated that the USFHP beneficiaries were on average less sick than the baseline population and resulted in a downward adjustment of the baseline costs (and thus lower ceiling rates).

93. In other words, the HSAs were intended to ensure that the Designated Providers were paid more if they were providing health services to a population of people who, on the whole, were sicker (and thus more costly to care for) than the baseline population. The DPs would be paid less if they were providing health services to a population of people who, on the whole, were healthier (and thus less costly to care for) than the baseline population.

94. Even a seemingly small change in an HSA could have a significant impact on the ceiling rates and a DP's revenue. For example, a one percentage point increase in an HSA (i.e., an HSA that went from 1.01 to 1.02) would increase the DP's final ceiling rates by approximately one percent, which could increase that DP's revenue from the USFHP program by over one million dollars in a single year.

95. The process for determining the HSA for each Designated Provider was similar to the process used to determine the ceiling rates. *See* paragraphs 69-78, *supra*. Kennell would prepare a separate memo describing the steps it purported to have taken to calculate each Plan's HSA and would send that memo and supporting materials to the Plan. TMA and the Plan would

then discuss possible revisions and refinements to the HSA calculations in order to ensure that the HSA complied with the three material requirements.

96. Consistent with Section 9.2.2.3.e of the USFHP Contracts, the HSAs were not recalculated every year. As a result, the HSA used in the Base Period for a particular DP was the same as the HSA used in OP1 for that DP. All DPs had their HSAs recalculated in 2010. Those 2010 HSAs were used for the OP2 and OP3 ceiling rates.

97. For those four periods—the Base Period, OP1, OP2, and OP3—the baseline population used to calculate both the baseline costs and the HSAs was all Medicare beneficiaries living in each DP's service area. As a result, in their communications, the Parties sometimes referred to the method of calculating the ceiling rates for OP3 and earlier periods as the "Medicare Methodology," the "current methodology," the "OP3 methodology," or the "old methodology." The term "Medicare Methodology" will be used herein to refer to this method.

### C. The HSAs Used to Develop the Base Period, OP1, OP2, and OP3 Ceiling Rates Were Infected by Two Errors.

98. Until 2012, the Parties and their actuarial consultants at Kennell and Milliman all believed that the HSAs that had been used in OP3 and earlier periods were correctly calculated and that, for each DP, those HSAs accurately compared the relative health statuses of the DP's beneficiaries and the baseline population. In 2012, Defendants first learned that this belief was mistaken. *See* Section V.D., *infra*. TMA, however, did not learn that this belief was mistaken until after Relators' *qui tam* complaint was filed. *See* Section V.F.iii., *infra*.

99. When the Medicare Methodology was used (i.e., for Base Period through OP3), Kennell calculated the HSAs by dividing average risk scores for the USFHP beneficiaries for a particular DP (the numerator of the fraction) by average risk scores for all Medicare beneficiaries living in that DP's service area (the denominator of the fraction).

100. When using the Medicare Methodology, Kennell did not calculate the average risk scores that made up the denominators of the HSA fractions. Instead, Kennell relied on the average risk scores that CMS itself calculated at a county-by-county level using the CMS Model and published on its website. CMS calculated these risk scores by following the instructions provided in the RAPS Guide CMS itself published. Kennell used those published risk scores in the denominators of its HSA calculations.

101. CMS, however, did not publish county-by-county risk scores for USFHP members. Kennell, therefore, had to calculate the risk scores that made up the numerators of the HSA fractions. Kennell input enrollment and claims data for the USFHP beneficiaries enrolled with each Designated Provider into the CMS Model to calculate average risk scores for each DP.

102. The HSA memos sent to the Plans—both those regarding the HSAs used for Base Period and OP1, and those regarding the HSAs used for OP2 and OP3—memorialized this process. Those memos indicated that Kennell had calculated the risk scores for the Plans' USFHP beneficiaries (i.e., those in the numerators), whereas the risk scores for the comparable Medicare beneficiaries (i.e., those in the denominators) had been derived from risk scores published on CMS's website.

103. For an HSA to be actuarially sound and to provide a meaningful and accurate health status comparison of the USFHP population and the baseline Medicare population, the two sets of risk scores needed to be calculated in the same manner. Accordingly, Kennell needed to calculate the USFHP risk scores (used in the numerator) in the same manner as CMS calculated the Medicare risk scores (used in the denominator) for the HSAs to be actuarially sound and to provide a meaningful and accurate comparison. In essence, the comparison had to be "apples to apples."

104. Prior to 2012, however, Kennell made two errors when calculating the USFHP risk scores using the CMS Model. These erroneous risk scores were then compared to correctly calculated risk scores to derive the HSAs, which were in turn used to establish the ceiling rates. Kennell's errors impacted the HSAs used to calculate the ceiling rates in Base Period, OP1, OP2, and OP3.

**i. The Filtering Error**

105. The CMS Model is designed, calibrated, and intended to be run using claims that have a high likelihood of containing accurate diagnoses. Therefore, the RAPS Guide specifies that only claims from certain sources (or categories of providers) and for specific types of services should be input into the model. Any claims likely to contain unreliable diagnosis data (which may make a beneficiary appear sicker than he or she actually is) should not be input into the model. Thus, before inputting any claims data into the CMS Model, claims from sources or service types other than those specified in the RAPS Guide should be excluded, or filtered out. Hereinafter, this concept is referred to as "filtering."

106. The RAPS Guide instructs that claims input into the CMS Model should be drawn only from the following sources: hospital inpatient and outpatient, physician, and clinically trained non-physician (e.g., psychologist, podiatrist). The creators of the model presumed that claims submitted by trained medical personnel at hospitals or physicians' clinics are more accurate than diagnoses submitted by other types of providers, such as home health or hospice providers. The RAPS Guide instructs that other sources of claims—such as skilled nursing facility, home health, and hospice claims—should be filtered out before claims are input into the model.

107. The RAPS Guide further instructs that there are several service types that should be excluded (or filtered out), regardless of the source of the claim, before the claims data is input

into the CMS Model. These service types include laboratory tests, diagnostic radiology, and ambulance services. For claims associated with diagnostic tests, such as lab work or x-rays, the diagnosis listed on the claim could be a condition being tested for, not a condition that has been confirmed. Because the diagnosis listed on the claim might ultimately be ruled out by the test (and thus not be a condition the patient actually has), such claims should be filtered out and not input into the CMS Model because they might make the patient appear sicker than he or she actually is.

108. If claims are not filtered properly before they are run through the CMS Model, then beneficiaries may inaccurately appear sicker than they would if the claims were filtered properly. Failing to filter would thus, on the whole, increase average risk scores across a population.

109. In calculating the USFHP beneficiary risk scores used in the numerators of the HSAs, Kennell input claims from all sources and all service types into the CMS Model. In other words, Kennell did not filter out any claims from inappropriate sources or provider types (such as home health or hospice providers) before running claims through the CMS Model. Nor did Kennell filter out any claims from inappropriate service types (such as laboratory services or x-rays) before running claims through the CMS Model. The term "Filtering Error" will be used herein to refer to Kennell's failure to filter out any inappropriate claims before running them through the CMS Model.

**ii. The Prospective Error**

110. The RAPS Guide describes the CMS Model as a "Prospective Model." This means that the CMS Model is designed, calibrated, and intended to be run using diagnostic information from one year to predict total costs for beneficiaries in the following year.

111. To run the CMS Model prospectively, the data input should be sourced from two different years: enrollment data (a list of beneficiaries and their demographic data, such as age and gender) should be from one year, and claims data (containing information about those beneficiaries' diagnoses codes and health conditions) should be from the prior year. Beneficiaries who do not have historic claims data available should be given a "new enrollee" risk score, which is based on their demographic data alone.

112. If the CMS Model is run using enrollment data and claims data from the same year (i.e., run concurrently, not prospectively), the results will be meaningless. And, typically, the results for a cohort of beneficiaries will be biased upward (i.e., be overstated), making the cohort appear sicker (and more costly to care for) than it would if the model were run prospectively. This is because individuals typically develop more health conditions over time, especially chronic conditions that persist from year-to-year. And the CMS Model already accounts for the likelihood that a beneficiary will develop additional costly health conditions in future years.

113. Running a prospective model concurrently would thus, on the whole, increase average risk scores across a population.

114. When calculating the USFHP beneficiary risk scores used in the numerators of the HSAs, Kennell input enrollment data and claims data from the same year into the CMS Model. And it did not give beneficiaries without historic claims data available a "new enrollee" score. In other words, Kennell did not run the model prospectively. The term "Prospective Error" will be used herein to refer to Kennell's failure to run the CMS Model prospectively.

**iii. The Significance of the Two Errors**

115. Both the Filtering Error and Prospective Error were truly errors or mistakes. Running the CMS Model with either error (or both errors) was not justified by any mathematical or logical principle, nor were these actuarially sound ways to run the model.

116. Calculating the USFHP risk scores with either the Filtering Error or Prospective Error, or with both, caused the USFHP beneficiary populations as a whole to appear sicker than they actually were, which caused the average risk scores for the USFHP populations to be higher than they would have been had Kennell run the model correctly.

117. The significance of these errors was magnified when the risk scores Kennell calculated with the Filtering Error and Prospective Error were compared to Medicare risk scores that CMS had calculated by running the model correctly (i.e., without making the Filtering Error or the Prospective Error). Kennell's practice of calculating the USFHP risk scores with both the Filtering Error and Prospective Error, and then comparing those risk scores to Medicare risk scores that CMS had calculated and published online in the Base Period, OP1, OP2, and OP3 will be referred to as the "HSA Errors."

118. The HSA Errors caused the HSAs calculated for each DP in the Base Period, OP1, OP2, and OP3 to be higher than they would have been had Kennell run the CMS Model correctly.

119. Using an HSA that was higher than it should have been in turn caused the ceiling rates paid to the DPs in Base Period, OP1, OP2, and OP3 to be higher than they would have been had Kennell run the model correctly. In 2012, the Plans' actuary performed calculations that indicate that the HSA Errors caused the ceiling rates to be overstated for each DP by between 9.5 percent and 14.4 percent.

120. Because the HSA Errors caused such a significant overstatement of the HSAs, and the resulting ceiling rates, those resulting ceiling rates were set at a level far in excess of the costs that the government would have incurred had the enrollees received their health care services through a military treatment facility, the TRICARE program, or the Medicare program.

121. For these reasons, the HSA Errors caused the ceiling rates TMA paid to each of the DPs in the Base Period, OP1, OP2, and OP3 to exceed the limitation imposed by Section 726(b) of the NDAA (i.e., to exceed the statutory limit).

122. The HSA Errors also caused the ceiling rates TMA paid to each of the DPs in the Base Period, OP1, OP2, and OP3 to not be actuarially sound, as required by the NDAA (i.e., to violate the actuarial soundness requirement).

123. The HSA Errors also meant that the HSAs used for the Base Period, OP1, OP2, and OP3 ceiling rates did not accurately compare the health status of the DPs' enrollees to the Medicare beneficiaries in the DPs' service areas. Indeed, when Kennell calculated the HSAs with the HSA Errors, it did not actually use Medicare's method of measuring health status to calculate those HSAs. This meant that the HSAs were not calculated consistent with the Parties' intent and understanding regarding calculation of the HSAs and were not calculated in accordance with contractual provision 9.2.2.3.e (i.e., they violated the health comparison requirement).

124. Because the HSA Errors caused the ceiling rates TMA paid to each of the DPs in the Base Period, OP1, OP2, and OP3 to be higher than they would have been had the ceiling rates been calculated in compliance with the material requirements, those rates will be referred to herein as "improperly inflated."

125. When the HSAs used for the Base Period, OP1, OP2, and OP3 ceiling rates were calculated, however, no one realized that Kennell had made the HSA Errors or that the ceiling rates violated any of the material requirements.

**D. Defendants Eventually Learned of the Two Errors (But TMA Did Not).**

126. The HSA Errors first came to light in 2012 when TMA attempted to change how the ceiling rates were being calculated. During the process of making this change, the actuaries at Kennell and Milliman uncovered the HSA Errors. The actuaries informed Defendants of these errors, but not TMA.

**i. Rates Paid in 2008-2012: As a Result of the HSA Errors, the Plans Had Been Earning [redacted] Profit Margins on the USFHP Program for Years.**

127. When they were being paid ceiling rates in Base Period, OP1, OP2, and OP3 (i.e., 2008 through 2012), the USFHP program was extremely lucrative for all of the Designated Providers.

128. As the Designated Providers acknowledged in proposals they submitted to TMA in 2008 prior to being awarded the USFHP Contracts, a profit margin in the range of 4% to 6% would be reasonable and consistent with industry benchmarks for large health plans.

129. Yet, Brighton Marine, Christus, Martin's Point, PacMed, and St. Vincent's all consistently recorded profit margins on their USFHP plans that [redacted].

130. For example, St. Vincent's annual operating gain for its USFHP plan in calendar year 2008 was a [redacted]%. In 2009, that number was [redacted]%. In 2010, 2011, and 2012, those numbers were [redacted]%, [redacted]%, and [redacted]%, respectively.

131. Johns Hopkins also realized [redacted] profit margins on its USFHP plan during the entire 2008 through 2012 period. This is illustrated by comparing Johns Hopkins's USFHP plan

to another managed care health plan Johns Hopkins operated, called Priority Partners. Johns Hopkins's USFHP plan was [redacted]. For the year ending June 30, 2012 (during which Johns Hopkins had been paid at the OP2 rates for part of the year and the OP3 rates for the remainder of the year), Johns Hopkins recorded profits per member per month of $[redacted] on its USFHP plan. [redacted], for that same year, Johns Hopkins recorded profits per member per month of $[redacted] for the Priority Partners plan. [redacted].

132. Indeed, long before the HSA Errors came to light, Johns Hopkins expressed discomfort with how favorable the ceiling rates seemed to be. In April 2009, after receiving the initial draft ceiling rate package from TMA proposing OP1 rates that would have resulted in approximately $11 million less in revenue for Johns Hopkins for fiscal year 2010 than what Johns Hopkins had projected (for reasons wholly unrelated to the HSA Errors), the President of Johns Hopkins HealthCare LLC remarked to a colleague: "Gravy train is over!! (Well, not quite. I am actually glad this is happening. The rates were just getting too lucrative for comfort.)" Her colleague replied to the President that she was "right to say that it was getting too good."

133. Upon information and belief, neither Johns Hopkins nor any other Designated Provider attempted to figure out why it was earning such [redacted] profit margins on its USFHP plan (e.g., whether the lucrative ceiling rates might be the result of an error or other anomaly). In addition, upon information and belief, none of the Designated Providers ever informed TMA of

the profit margins they were earning on their USFHP plans or even advised TMA that their profit margins were [redacted] the profit margins the DPs themselves had identified to TMA as reasonable and consistent with industry benchmarks. Rather, the DPs were content to quietly reap these [redacted] profits and to continue to find ways to advocate for higher ceiling rates.

**ii. Rate Discussions in 2011: The Switch to the TFL Methodology Was First Attempted.**

134. TMA was unaware of the [redacted] profit margins the Plans were earning on the USFHP program; indeed, TMA was not authorized to obtain information about the Plans' costs or profits. TMA, however, had observed that the government's payments to the Plans had seemed high.

135. Partially in an effort to address this, in 2011, when the process for setting the OP3 rates began, TMA proposed a change in how the ceiling rates would be calculated. Specifically, TMA expressed an interest changing the baseline population from all Medicare beneficiaries living in a DPs' service area to only those Medicare beneficiaries who were also receiving supplemental benefits from TRICARE because of current or prior military service (through a program called TRICARE for Life or "TFL"). In their communications, the Parties sometimes referred to this new method of calculating the ceiling rates as the "TFL Methodology," the "proposed methodology," the "OP4 methodology," or the "new methodology." The term "TFL Methodology" will be used herein to refer to this method.

136. TMA wanted to move to the TFL Methodology because Kennell advised TMA that using the TFL Methodology was a better way to calculate the ceiling rates. Using the TFL Methodology instead of the Medicare Methodology would require Kennell to make fewer assumptions, would allow use of more recent data, and would involve comparing the USFHP

population to a more similar baseline population (i.e., TFL beneficiaries instead of the entire Medicare population).

137. TMA also understood (and was told by Kennell) that using the TFL Methodology might help to lower the costs of the USFHP program and reduce the ceiling rates paid to the DPs.

138. In fact, the original draft ceiling rates developed by Kennell in 2011 using the TFL Methodology would have represented a significant reduction in the ceiling rates.

139. To avoid any confusion, when it began using the TFL Methodology, Kennell started referring to what had been called the HSA as the Selection Adjustment or SA. Despite the name change, this factor was intended to perform the same function in the TFL Methodology as the HSA had when the Medicare Methodology was used.

140. Under the TFL Methodology, Kennell continued to calculate the average risk scores for the USFHP beneficiaries (which made up the numerators of the SA fractions). However, rather than using published risk scores calculated by CMS for the baseline population, Kennell started calculating the average risk scores for the baseline population of TFL beneficiaries (which made up the denominators of the SA fractions).

141. Kennell thus now calculated the risk scores that would go into both parts of the SA fractions. As a result, any errors made in running the CMS Model affected both the numerators and denominators. And it was not necessarily clear in advance of performing any particular calculation whether any errors made in running the CMS Model would have a greater impact on the numerators or denominators of those SA fractions and thus it was not clear whether any errors would cause the resulting SAs to be over- or understated.

142. In 2011, the Designated Providers objected to using the TFL Methodology for the OP3 rates. The DPs objected because the proposed OP3 rates calculated using the TFL

Methodology were much lower than the OP2 rates they were being paid at the time, and neither Milliman nor Kennell could explain the reason for the steep reduction in rates. The DPs also objected because Milliman was unable to get access to the TFL data in time to validate it and make sure it was being used in an actuarially sound manner.

143. In August 2011, because of those objections, TMA agreed to continue using the Medicare Methodology to set the OP3 ceiling rates. Those OP3 rates were eventually set using the Medicare Methodology and the same HSAs that had been used for the OP2 rates.

**iii. Rate Discussions Begin in 2012: The TFL Methodology Was Actually Implemented and the HSA Errors Were Discovered.**

144. When the discussions about the OP4 rates began in early 2012, TMA indicated it intended to move to using the TFL Methodology for those rates.

145. In an effort to facilitate this switch, in early 2012, Kennell and Milliman both started examining the TFL Methodology and the underlying TFL data more closely in an effort to understand and explain why that methodology produced lower rates than those produced using the Medicare Methodology. During this examination, and the examination that continued throughout 2012, Kennell and Milliman uncovered the HSA Errors. Defendants were made aware of the existence and impact of the HSA Errors in 2012, but TMA was not.

146. In the spring of 2012, Dave Kennell and Geof Hileman of Kennell & Associates spoke with individuals at TMA and DOD about Kennell's development of the USFHP rates and use of the TFL data.

147. As part of this process, Dave, Geof, the Contracting Officer (Bea), the Program Manager (Danielle), and other individuals at TMA participated in a call on April 4. On this call, a TMA analyst, who was otherwise not involved in the USFHP rate-setting process, brought up guidance about excluding certain claims when running the CMS Model (i.e., filtering). On that

call, however, neither Dave nor Geof informed TMA that they had not been filtering claims when calculating the HSAs used in OP3 and earlier periods (or when calculating the SAs that they had initially developed in 2011), or had made any error or mistake that would have impacted prior HSAs or ceiling rates.

148. After the call, that analyst sent Dave and Geof (copying others) the guidance to which he was referring (i.e., the RAPS Guide, *see* paragraph 88, *supra*). When Geof received and reviewed the RAPS Guide, he realized for the first time that he had been making the Filtering Error when calculating risk scores, including the risk scores that went into the HSAs used to determine the ceiling rates for OP3 and earlier periods.

149. Within a few hours of receiving the RAPS Guide, Geof also understood that the Filtering Error might have at least partially explained why the HSAs were as high as they had been in the past. Geof shared this understanding with Dave the same day he received the RAPS Guide. In the following months, Dave and Geof also realized that the Filtering Error explained why the ceiling rates calculated using the Medicare Methodology had been higher than the rates Kennell initially developed using the TFL Methodology.

150. Although Kennell quickly understood the impact the Filtering Error had on the ceiling rates paid to the DPs in OP3 and earlier periods, Kennell's statements to TMA throughout 2012 that referenced filtering were incomplete and misleading. *See* Section V.F.ii., *infra*. For example, shortly after the April 4 call, Dave sent Bea and Danielle an email saying he was happy that the TMA analyst who joined that call (and later sent the RAPS Guide) did not identify any issues that would cause Kennell to redo any of the rates. No one at Kennell sent a follow up email to TMA to clarify, supplement, or correct that email after Kennell recognized that the

HSAs used in OP3 and earlier periods (and the resulting ceiling rates for those periods) had been overstated due to the Filtering Error.

**iv. Rate Discussions Continued Throughout 2012: Defendants Were Informed of the Errors.**

151. On April 11, Kennell sent the initial draft ceiling rate packages for OP4 to the Designated Providers. Those proposed ceiling rates had been calculated using the TFL Methodology, but the packages contained a placeholder for the SA calculations that were to follow.

152. On April 20, Kennell sent the initial memos calculating the SAs for OP4 to the Designated Providers. The memos stated that Kennell had excluded claim types identified in the RAPS Guide and explained that it was excluding claims from both the USFHP risk score calculation and the TFL risk score calculation.

153. Around this time, Kennell told Tim Wilder that Kennell had identified a potential error in the SA calculations Kennell had performed in the prior year (when Kennell first attempted to calculate rates using the TFL Methodology). This error involved Kennell's inclusion of all claims when running the CMS Model to calculate the USFHP and TFL risk scores that were used in the SAs (i.e., Kennell had made the Filtering Error in 2011 when calculating preliminary SAs). Additionally, Kennell told Tim that this potential error also would have impacted the HSA calculations that had been used to develop the ceiling rates paid to the DPs for OP3 (i.e., Kennell had made the Filtering Error when calculating the HSAs used in OP3) and that Kennell would correct this error in any updates to the Medicare Methodology.

154. On April 22, Tim emailed the Finance Committee Chair, who represented Brighton Marine on the Finance Committee, about his efforts to model possible rates for OP4. He observed that the Designated Providers may be "better off" financially if the ceiling rates

were calculated using the TFL Methodology rather than the Medicare Methodology. This was because he recognized that, if the Medicare Methodology was used in OP4, Kennell would factor in the excluded claims—i.e., fix the Filtering Error—when recalculating the HSAs. This would cause those HSAs, and the resulting ceiling rates, to be lower than they had been in OP3 and earlier periods.

155. In response, the Finance Committee Chair calculated a preliminary breakdown of how much the monthly amount paid to Brighton Marine would change if the Medicare Methodology was retained and the HSAs were reduced. This response demonstrates an immediate understanding by the Finance Committee Chair that, in prior years, the Filtering Error had caused the HSAs to be higher than they would have been absent the Filtering Error and that the Filtering Error had caused the DPs to be paid more than they otherwise would have been.

156. On April 23, the Finance Committee had a call to prepare for the OP4 ceiling rate discussions. On this call, Tim provided some highlights concerning the most recent developments related to the OP4 rates. During this portion of the call, Tim reported that Kennell made adjustments to the risk score calculations.

157. When the minutes from that April 23 meeting were distributed to the Finance Committee, Steve Weiner instructed the recipients that due to the "sensitive nature of the information" contained within those minutes that they "should be maintained as extremely confidential." An instruction like this was not typically provided when Finance Committee meeting minutes were circulated.

158. The following week, on May 2, Tim informed the Finance Committee via email that he had begun estimating the ceiling rates for OP4 using the Medicare Methodology, as requested. Tim stated he would anticipate several updates to that methodology if it were used

again. One of those updates concerned filtering. Tim explained he would expect, among other things, for Kennell to update the HSAs. He explained that Kennell had identified a potential error in the SA calculation developed in the prior year when TMA first attempted to use the TFL Methodology: when claims were run through the CMS Model, all claims were included, which led to overstated risk scores (i.e., Kennell made the Filtering Error). Tim also reported that Kennell asserted that this error not only impacted the SA calculations performed in 2011, when TMA first attempted to switch to the TFL Methodology, but that this error also impacted the "original Health Status Adjustment calculation used in the OP3 ceiling rates." Tim believed that Kennell would correct this in any update to the Medicare Methodology.

159. In his email, Tim further observed that the impact of correcting this error would be larger on the HSAs developed using the Medicare Methodology than on the SAs developed using the TFL Methodology. This was because, under the Medicare Methodology, only the USFHP risk scores (in the numerator) had been calculated with the Filtering Error, whereas the published Medicare risk scores (in the denominator) were calculated correctly (i.e., with filtering performed).

160. Later that day, Tim discussed the contents of his May 2 email on a phone call with the Finance Committee. The Alliance's Executive Director later wrote to the Finance Committee Chair that she kept the meeting minutes from that May 2 call "very broad," given the "sensitive nature of the discussions." None of the topics discussed in the May 2 minutes were sensitive other than Tim's analysis of the OP4 rates.

161. After a visit to Kennell's offices on or around May 7, Tim recognized that Kennell had failed to correct the Filtering Error completely in the April 20 SA packages. Tim

also discovered that Kennell had not been running the CMS Model prospectively (i.e., had been making the Prospective Error).

162. On May 30, Tim wrote an email to the Finance Committee in preparation for a call later that day. In that email, he shared with the Finance Committee his projection of the OP4 ceiling rates using the Medicare Methodology. Once again, when calculating potential OP4 rates using the Medicare Methodology, Tim noted that the HSAs would need to be updated because Kennell had inadvertently included all claims when calculating the USFHP risk scores (i.e., made the Filtering Error), which overstated the HSAs. Tim's email was clear that Kennell's failure to filter was an error. Tim said that correcting this error would reduce the ceiling rates between 4 and 10 percent, depending on the Designated Provider.

163. In this email to the Finance Committee, Tim also referenced the Prospective Error for the first time. He wrote that, when using the TFL Methodology, Kennell was running the CMS Model using members (i.e., enrollment data) and diagnosis codes (i.e., claims data) from the same year.[1] Tim further explained that the CMS Model was a prospective model, intended to be run with member data from one year and diagnosis codes from the prior year. For the OP4 calculations, 2009 member data should have been input into the model along with those members' 2008 diagnosis codes.

164. Tim discussed the contents of his May 30 email on a phone call with the Finance Committee. According to a draft of the Finance Committee Meeting Minutes that memorialized

[1] This portion of Tim's May 30 email to the Finance Committee contains a typo. The email says that the CMS Model is being run "as if it were a prospective model." Tim has stated that he meant to say "as if it were a concurrent model" in this sentence. To the extent anyone on the Finance Committee was confused, this was most likely clarified on the May 30 Finance Committee call and it was certainly clarified by Tim in his June 6 email, discussed in paragraphs 165-166, *infra*.

that May 30 call, Tim characterized Kennell's failure to filter as a "major area" that would have a "significant impact on all plans."

165. On June 6, Tim informed the Finance Committee, both in writing and over the phone, that Kennell had failed to correct fully the Filtering Error when it calculated the most recent iteration of the Selection Adjustments. Kennell had properly excluded impermissible sources of claims, but it had failed to fully remove all claims that had impermissible service types. Tim stated that the biggest issue with Kennell's efforts at filtering was that Kennell had failed to filter out diagnostic radiology claims.

166. Tim also explained to the Finance Committee that the CMS Model was a prospective model, designed to be run using diagnosis codes (i.e., claims data) from one year and a membership file (i.e., enrollment data) from the following year. The purpose of this design was to project costs for a current set of beneficiaries. Tim stated that Kennell was running the model as if it were a concurrent model, inputting claims data and enrollment data from the same year.

167. According to contemporaneous handwritten notes taken by the Alliance's Executive Director during the June 6 Finance Committee meeting, the following was stated by participants on that June 6 call:

- [Kennell] had not been filtering in past, now they are for SA, would impact on HSA
- Don't think they understand what they are supposed to do – don't understand it
- Not applying filter to our scores
- SA Calculation – risk: doing it wrong prior – benefit from doing it right
- Feel uncomfortable not disclosing it

- DOD used wrong model
- Is D[ave] K[ennell] focusing on new methodology only? Yes – Tim
- Retro options – raised issue of [illegible word] Dept's ability to reach back

168. According to another set of contemporaneous notes taken during this meeting (this time by one of Johns Hopkins's representatives on the Finance Committee), the group also discussed the fact that "Medicare presumably already applied filter + prospective." And "Risk: DOD using concurrent 2009 data/membership for our current HSA. ? retro refund."

169. In other words, by June 6, the Finance Committee had been informed that the Filtering Error and the Prospective Error were both "errors," that Kennell had made both errors when computing the HSAs used for OP3, and that Tim did not think Kennell understood how to properly filter claims. The only reasonable conclusion that could be drawn from Kennell's failure to filter in the past, and its lack of understanding of how to properly filter claims in 2012 once it became aware of the Filtering Error, is that Kennell had not been correctly filtering claims in OP3 or in any earlier period.

170. Thus, by no later than June 6, Tim had informed Defendants of the existence of the Filtering Error and Prospective Error. (At this time, neither Kennell nor TMA had discovered or been informed of the existence of the Prospective Error.)

171. In his communications, Tim made it clear to Defendants that these errors were in fact mistakes, and not merely differences of opinion or competing (but actuarially legitimate) options for how to calculate risk scores when using the CMS Model.

172. In fact, in his communications, Tim never attempted to provide any justification or advance any argument that it would be appropriate to calculate risk scores using a method that contained either the Filtering Error or the Prospective Error, let alone both errors. Nor did he

ever try to explain or justify Kennell's practice of making the HSA Errors, whereby Kennell used one method to calculate the risk scores used in the numerators of HSAs (i.e., made the Filtering and Prospective Errors) and then compared those erroneous scores to risk scores in the denominator that had been calculated correctly.

173. Indeed, no actuary involved in the USFHP program has ever offered any justification for calculating the HSAs with the HSA Errors.

### E. By June 2012, Defendants Knew the HSA Errors Impacted the Base Period, OP1, OP2, and OP3 Rates and Caused the DPs To Be Overpaid in Those Periods.

174. Defendants were not simply informed about the existence of both the Filtering Error and the Prospective Error in the TFL Methodology being discussed in 2012. They were also made aware, via various emails, memos, and calls, that these same errors also occurred in OP3 and earlier periods and that the HSA Errors had caused TMA to significantly overpay the DPs in those periods.

#### i. Milliman Provided the Plans with a Detailed Analysis of the HSA Errors.

175. In June 2012, Defendants were deliberating about whether to try to convince TMA to continue to use the Medicare Methodology to calculate the ceiling rates in OP4 (as they had successfully done in 2011) or whether to acquiesce to the switch to the TFL Methodology for OP4. Accordingly, it became important for Defendants to understand the financial implications of switching from the Medicare Methodology to the TFL Methodology.

176. To help inform this decision, Milliman prepared a detailed written analysis and summary chart attempting to project the ceiling rates for OP4 using both the Medicare Methodology and the proposed TFL Methodology.

177. On June 11, Milliman's memo estimating the potential OP4 rates using both methodologies was sent to the Finance Committee. In this memo, each estimate started with the actual ceiling rates TMA had agreed to pay the Designated Providers for OP3. From there, the memo described a series of adjustments that would need to be made to transform the OP3 rates into OP4 rates using each methodology. For each adjustment, Milliman estimated the average percentage impact on revenue the particular change would have, as aggregated across all six Designated Providers. Attached to the memo was a table, called Table 1, listing the same adjustments described in the memo and showing their impact on aggregate revenue.

178. Under Milliman's projection of the OP4 rates *using the TFL Methodology*, the memo explained that the government would need to update the Selection Adjustment to fully fix the Filtering Error (which had only been partially fixed by Kennell at that point in time) and to fix the Prospective Error (which Kennell did not yet know about and thus had not attempted to address in any way). The combined impact of fixing these errors, beyond the adjustments Kennell had already made, would cause the revenue generated by the rates to *increase* by several percentage points.

179. Under Milliman's projection of the OP4 rates *using the Medicare Methodology*, the memo explained that both the Filtering Error and the Prospective Error would need to be fixed. The memo further noted that, because the HSAs compared the USFHP risk scores to risk scores published by CMS, these corrections would only impact the USFHP risk scores, and not the published Medicare risk scores. Thus, fixing the Filtering Error and the Prospective Error when using the Medicare Methodology would cause revenue to decrease in the aggregate, across all six Plans. Per Table 1, fixing the Filtering Error would cause aggregate revenue to *decrease*

by 5.6 percent and fixing the Prospective Error would cause aggregate revenue to *decrease* by 7.7 percent.

180. The Finance Committee discussed the substance of the June 11 memo on a June 11 call. After that call, Tim sent representatives for each Designated Provider a table similar to the Table 1 that was attached to the June 11 Milliman memo. This second table, however, contained ceiling rate projections specific to that particular Plan and showed the impact of each change on that Plan's annual revenue. In emails transmitting those Plan-specific tables, Tim stated that he believed the impacts provided were reasonable.

181. In each Plan-specific table, the bottom of the table listed (as percentages) the current OP3 HSA, as well as a projected, recalculated HSA for OP4 using the Medicare Methodology. The table also listed (as percentages) a current SA, as initially proposed by Kennell for OP4, as well as a projected, recalculated SA for OP4.

182. Each Designated Provider's Plan-specific table showed that fixing the Filtering Error and Prospective Error under the *TFL Methodology* would cause the SA originally proposed by Kennell to increase (and thus the ceiling rates originally proposed by Kennell for OP4 would also *increase*). By contrast, each Plan-specific table showed that fixing the HSA Errors under the *Medicare Methodology* would cause the HSA to decrease as compared to the HSA used in OP3 (and thus the ceiling rates would *decrease* between OP3 and OP4 if the Medicare Methodology was maintained).

183. Defendants considered the results of this analysis when deciding on their strategic approach in 2012 with respect to the OP4 rates. As discussed in more detail below, Defendants ultimately agreed to recommend that TMA switch to the TFL Methodology for OP4 because

they recognized that doing so would be more lucrative for them, in the aggregate, than maintaining the Medicare Methodology once the HSA Errors had been corrected.

184. Not only did Tim's charts help guide Defendants during the OP4 negotiations, but Tim's charts also indicated that the HSA Errors had led to overpayments in OP3 and earlier periods. The Medicare Methodology portion of the chart began with the OP3 rates being paid to the DPs at the time they received this memo. Tim then made adjustments that he believed would be necessary if the Medicare Methodology was used again. Those adjustments included fixing the HSA Errors. Thus, the June 11 memo was premised on the understanding that both the Filtering Error and the Prospective Error had been made when Kennell calculated the OP3 rates and that those errors had resulted in rates that were significantly higher than they would have been absent the errors. The chart further showed that, if the HSA Errors were fixed, the ceiling rates would decrease. This meant that the OP3 rates the Designated Providers were being paid *at the time they received the June 11 memo* were improperly inflated due to the HSA Errors (and that the OP2 rates, which used the same HSAs that had been used in OP3, were similarly impacted by the same errors). This Table 1 and the memo to which it was attached were provided to the Defendants, but neither the memo nor tables was ever provided to the Contracting Officer, Program Manager, or anyone else at TMA.

**ii. The Plans Received Additional Information Indicating That the HSA Errors Had Inflated the OP3 Rates.**

185. Despite this detailed memo, throughout the summer the Designated Providers continued to ask Milliman why the ceiling rates proposed by Kennell for OP4 were so much lower than the rates they were being paid for OP3.

186. Tim continued to explain to the Designated Providers that prior rates had been impacted by the Filtering Error and Prospective Error. Because prior rates contained those

errors, those prior rates were inflated. Thus, once accounting for the correction of the Filtering and Prospective Errors, the difference in rates between the TFL Methodology and the Medicare Methodology was not as dramatic as it first appeared. In fact, by switching to the TFL Methodology for OP4, all but one of the Designated Providers would experience a smaller decrease in rates than they would have seen if the Medicare Methodology were used again (with the HSA Errors fixed). *See* paragraph 210, *infra*.

187. On June 20, for example, Tim informed the Finance Committee that, if the Medicare Methodology was used again for OP4, all Plans would see a reduction in rates of between 15 and 18 percent, and perhaps as much as 20 to 24 percent. He further explained that the reason for this decrease would be the corrections to the HSA, namely the need to correct the Filtering Error and the Prospective Error. By contrast, if the Plans agreed to use the TFL Methodology, the OP4 rates would only decrease by between 7 and 18 percent.

188. On August 15, Tim informed the Finance Committee of what he had learned during his on-site visit to Kennell's office. Tim recounted how, during that visit, he had asked Geof Hileman to change his approach to running the CMS Model and calculating the Selection Adjustments in a number of ways to ensure that Kennell was running the model and calculating risk scores correctly. The only reasonable conclusion to draw from Tim's continued suggestions and corrections, and Kennell's failure to fully correct the Filtering and Prospective Errors in the Selection Adjustments by August, was that Kennell did not know how to correctly use the CMS Model in 2012 or in any *prior* year. Tim also recounted that, during this visit, Geof acknowledged to Tim that the prior HSAs were incorrectly calculated. Tim did not report that Geof said anything to him about making a similar disclosure to TMA.

189. And, if Defendants had any doubt that Kennell had been making the Prospective Error when it had calculated the HSAs in OP3 and earlier periods, those doubts should have been put to rest early in 2013. At this point in time, Geof continued to have questions for Tim about how to properly run the CMS Model prospectively. The questions Geof posed to Tim, which were passed along to some members of the Finance Committee, re-emphasized that Geof did not understand how to correctly run the CMS Model prospectively, thus, once again, supporting the conclusion that Kennell had never correctly run the model in the past.

**iii. Internal Communications within the Plans Show That They Understood the Erroneous HSAs Caused Them to Be Overpaid in OP3 and Earlier Periods.**

190. Internal communications within the various Designated Providers further demonstrate that the DPs understood that the HSA Errors had been made in OP3 and earlier periods, and that those HSA Errors had led to each of the DPs being paid inflated ceiling rates. *See also* paragraph 225, *infra*.

191. On June 29, Finance Committee members from Martin's Point provided their CEO with an update on the USFHP rate negotiations. That one-page update began with a brief summary that explicitly stated that the "Health Status Adjustment in previous rates was flawed to the benefit of MPHC," i.e., Martin's Point.

192. In July, PacMed's leadership was discussing specific components of the ceiling rate calculations with Bob Cosway, a Milliman actuary who worked with Tim on the USFHP rate discussions. On July 16, Bob wrote to PacMed and stated that Milliman had estimated a big reduction in ceiling rates under the Medicare Methodology if Dave corrected the error in the HSA calculation. Bob told PacMed's leadership that he had confirmed with Tim that the estimated reduction in rates reflected the correct way to calculate the risk scores. Bob's email to PacMed continued by saying that the TFL Methodology produced better results for the DPs than

the Medicare Methodology, unless Defendants could get TMA to use the Medicare Methodology without fixing any of the errors. But Bob told PacMed he had gotten the impression that such an outcome was unlikely.

193. On July 19, Milliman sent a memo to Martin's Point estimating the OP4 ceiling rates using the methodology that had been used during the Base Period. In this memo, Tim said his best guess was that TMA would argue that even under the methodology used during the Base Period, the HSA would need to be updated because there were errors in the prior calculations that would need to be corrected.

194. On July 24, a Senior VP at Steward prepared a quarterly report for the board of Brighton Marine. In that report, the Senior VP wrote that "DoD introduced methodological changes in how the over 65 rates are being calculated and also identified issues with their calculations of prior methods." He stated that rates would decrease by 11 or 12 percent in OP4 and that most of that reduction "is related to correction of prior calculations of the over 65 health status adjustment."

195. On October 2, that same Steward Senior VP provided an update on the resolution of the USFHP rate negotiations to Brighton Marine's CEO. In this email, the Senior VP stated that Martin's Point was still considering trying to convince the government to maintain the Medicare Methodology. *See* paragraph 246, *infra*. But he again pointed out that the Medicare Methodology "contains the health status adjustment error." He did not provide any more detail about the error, presumably because the CEO of Brighton Marine was already generally familiar with "the health status adjustment error" from prior communications.

196. In October, the leadership of Martin's Point received the results of a survey that had been administered to its employees. That survey asked employees what was "ONE thing

that leadership doesn't know and NEEDS to know to make Martin's Point a great place to work." One employee, who worked in the Finance and Accounting department, responded that:

- It's actually a bad thing when the government overpays for a service - even if they overpay us. It was wasteful spending by the DoD and now we have an infrastructure that depends on being overpaid.

197. Moreover, if there had been any doubt that the HSA Errors had resulted in significant overpayments to the Plans in OP3 and earlier periods, the [redacted] profit margins each Designated Provider had been making on its USFHP plan since the inception of their USFHP Contract would have put any such doubt to rest. *See* paragraphs 127-133, *supra*. Once the HSA Errors came to light in 2012 and the Designated Providers were educated about their impact, as discussed in paragraphs 174 through 196, *supra*, it became clear that the lucrative ceiling rates that had been a "gravy train" for the DPs since at least 2008 had resulted, at least in part, from the HSA Errors that had improperly inflated the rates paid to the Designated Providers in the Base Period, OP1, OP2, and OP3.

* * *

198. In sum, no later than June 11, 2012, Defendants knew that the HSA Errors affected rates developed under the Medicare Methodology and paid to the DPs for OP3 and earlier periods. They also knew that the HSA Errors caused those ceiling rates to be substantially higher than they would have been absent the errors.

199. Defendants also knew that fixing the Filtering Error and Prospective Error had the opposite effect on rates when using the TFL Methodology. Fixing the two errors under the TFL Methodology increased SAs (and thus rates); whereas fixing those same two errors under the Medicare Methodology caused the HSAs (and rates) to decrease.

### F. TMA Did Not Become Aware of the Historic HSA Errors or Their Impact Until This *Qui Tam* Lawsuit Was Filed.

200. Once Defendants became aware of the HSA Errors and the impact of those errors, they attempted to thread a needle: they affirmatively combined, conspired, and agreed to disclose the Filtering Error and Prospective Error to TMA in the context of the TFL Methodology being proposed for OP4 (in order to get the errors fixed, so the rates would increase), but they sought to do so without telling TMA that the same two errors had been made in the past when the Medicare Methodology was used (in order to obscure the fact that due to those errors, the ceiling rates had been improperly inflated and, as a result, the Plans had received substantial overpayments in OP3 and earlier periods and were still being overpaid for OP3). By doing so, Defendants sought to maximize their profits under the USFHP Program without having to part with the overpayments they received in OP3 and prior periods.

201. Defendants were successful. TMA agreed to fix the Filtering Error and Prospective Error for OP4. But TMA never understood that those same two errors had caused the rates paid to the DPs for the Base Period, OP1, OP2, and OP3 to be in violation of the material requirements or that those errors caused the rates for those periods to be improperly inflated.

#### i. Defendants Had Several Opportunities to Inform TMA of the Historic HSA Errors, Their Impact, and the Resulting Overpayments, But They Never Did.

202. Defendants had several opportunities to disclose to TMA that the HSA Errors had occurred in OP3 and earlier periods, that those errors had caused the ceiling rates to be improperly inflated, and that the errors caused TMA to overpay the Plans. Defendants did not take these opportunities to be open, honest, forthcoming, and transparent with TMA. Instead, Defendants carefully crafted their communications with TMA such that any disclosure or

discussion of the Filtering Error or Prospective Error was made only in the context of discussing OP4 rates and the new TFL Methodology. Upon information and belief, Defendants deliberately avoided making statements they thought might prompt TMA to appreciate that the HSA Errors were made when the Medicare Methodology was used to calculate the ceiling rates paid for OP3 and earlier periods.

*a. Some Defendants considered not telling TMA about the Prospective Error (and certain aspects of the Filtering Error) at all.*

203. Shortly after Defendants learned of the HSA Errors, they became concerned that if TMA also became aware of these historic errors, then TMA might attempt to recoup the prior overpayments. As a result, throughout June, Defendants discussed how to approach the OP4 rate discussions in light of what they understood about the two errors and their impacts.

204. Defendants had two important decisions to make: whether to agree to the switch to the TFL Methodology and what, if anything, to say to TMA about the Filtering and Prospective Errors.

205. At the June 6 Finance Committee meeting, Defendants discussed whether Dave Kennell was focusing only on the TFL Methodology. This may have been because Defendants wanted to assess the risk of telling TMA about the Prospective Error and the remainder of the Filtering Error. It benefited the Plans to tell TMA about the errors in the context of the TFL Methodology (where fixing the errors would result in an increase in the proposed rates), but that benefit might not be worth the risk of TMA realizing that these same two errors had improperly inflated the rates and resulted in substantial overpayments when the Medicare Methodology was used in OP3 and earlier periods. As part of their deliberations, the Plans also discussed what TMA's "retroactive" options were, and whether it had the ability to "reach back" or receive a "retro refund" from the Designated Providers. Some individuals in attendance at this meeting

also claim that a Finance Committee member asked Steve Weiner for advice on these topics, and that Steve provided an answer several weeks later. *See* paragraph 222, *infra*.

206. Despite assurances that Dave was focusing only on the TFL Methodology, certain Finance Committee members were apparently concerned about what might happen if TMA realized that prior rates had been impacted by the HSA Errors. As a result, they openly discussed doing something that, absent such a concern, would have been illogical: not saying anything to TMA about the Filtering Error and the Prospective Error. This would have been a curious choice to make because, if the TFL Methodology were used, correcting these two errors would meaningfully increase all of the DPs' OP4 rates, both individually and in the aggregate. This discussion was also notable because, according to the Plans, Steve had advised them for years that, if they identified errors in the ceiling rate calculations before the ceiling rates were finalized and incorporated into a contract modification, the Plans were obligated to disclose those errors to TMA.

207. This concern was discussed on a June 2012 Finance Committee call. The discussion focused on lines 10 and 11 of Table 1 in Tim's June 11 memo—i.e., the two lines that showed the estimated impact of fixing the remainder of the Filtering Error and the Prospective Error in the context of the TFL Methodology. *See* Section V.E.i., *supra*. As lines 10 and 11 showed, correcting the Filtering and Prospective Errors when the TFL Methodology was used to calculate the OP4 rates would increase those rates for all DPs. Indeed, fully correcting the Filtering Error and correcting the Prospective Error in the context of the TFL Methodology would have increased the DPs' annual revenue in the aggregate by 3.8 percent and 2.6 percent, respectively (as shown in lines 10 and 11 of the TFL section of Table 1 in the June 11 Milliman

memo) and would have increased each DP's revenue overall (as shown in those same two lines in the Plan-specific tables Tim sent later that day).

208. Nevertheless, some of the Finance Committee members suggested that they could live with the OP4 rates TMA had recently proposed even if the Filtering and Prospective Errors were *not* disclosed and corrected. They thus seemed inclined to not push further on the issues captured in lines 10 and 11 of Table 1 (i.e., not disclose anything to TMA about the remainder of the Filtering Error and the Prospective Error). In other words, those Finance Committee members would have preferred to conceal those errors from TMA rather than disclose them and benefit from an increase in OP4 rates. It was rare for the DPs to be aware of a justifiable way to argue for a change that would significantly increase rates for all DPs but to consider not making that argument to TMA. The willingness of some DPs to potentially walk away from more lucrative OP4 rates by not asking TMA to correct the Filtering and Prospective Errors that year is further evidence of their desire to conceal the past overpayments they had received due to these errors.

209. At around the same time, Defendants were also considering whether to agree to TMA's proposal to use the TFL Methodology for OP4 or whether to push TMA to continue using the Medicare Methodology, as they had done in the prior year.

210. For all of the Designated Providers, there would be a significant decrease in rates between OP3 and OP4, regardless of which methodology was used for OP4. For five of the Designated Providers, using the TFL Methodology for the OP4 rates (once the Filtering Error and Prospective Error were fixed) would result in higher rates than if the Medicare Methodology was used again (with the HSA Errors fixed). For Martin's Point, the rates would be higher if the Medicare Methodology (with the HSA Errors fixed) was used again.

211. Representatives acting on behalf of some Defendants encouraged Martin's Point to agree to recommend switching to the TFL Methodology, even though the switch would not result in the highest possible rates for Martin's Point for OP4.

212. Upon information and belief, those representatives were concerned that if any DP continued to advocate for use of the Medicare Methodology for OP4, Kennell might try to calculate the OP4 rates using the Medicare Methodology (with the Filtering Error and the Prospective Error fixed). Defendants were concerned that, if Kennell performed such calculations, TMA might realize that the HSA Errors had caused the rates calculated under the Medicare Methodology to be overstated and TMA would then seek to recoup those overpayments.

213. The majority of the Plans prevailed, and Martin's Point agreed to allow the Alliance to unanimously recommend to TMA that the TFL Methodology be used to calculate the OP4 rates.

214. Once these June discussions concluded, Defendants agreed on an approach: the Alliance would disclose the Filtering and Prospective Errors to TMA in the context of the TFL Methodology as proposed for use in OP4, but the Alliance would make no mention of these errors in the context of the Medicare Methodology and would say nothing about these errors' presence in, or impact on, the rates for OP3 or earlier periods.

*b. When Defendants did disclose the two errors to TMA, they did so exclusively in the context of the TFL Methodology.*

215. To effectuate that agreement, Steve Weiner (on behalf of the Alliance and the Designated Providers) sent TMA an email on June 27 attaching a memo Milliman had prepared and a copy of the RAPS Guide. The Milliman memo did exactly what Defendants had agreed: it discussed the Filtering and Prospective Errors in the context of the TFL Methodology as

proposed for use in OP4 but made no mention of the Medicare Methodology and said nothing about these errors' presence in, or impact on, the rates for OP3 or earlier periods. Representatives acting on behalf of each DP and the Alliance reviewed this memo and did not object to sending it to TMA.

216. The Milliman memo was a highly technical document. It was written by actuaries, and its intended audience was actuaries. Any non-actuary readers would need to be advised by their own actuaries or other qualified professionals to properly interpret the memo's material.

217. The June 27 Milliman memo only discussed the TFL data and the TFL Methodology. The memo recommended that TMA move forward with using the TFL Methodology for OP4. The memo contained no discussion whatsoever of the Medicare Methodology.

218. The June 27 Milliman memo discussed both the Filtering Error and the Prospective Error, but only as they affected the TFL Methodology. The two errors were described in highly technical terms on the fourth and fifth pages of a ten-page memo. The memo recommended fixing both errors if the TFL Methodology was used.

219. The June 27 memo did not mention or imply that the HSA Errors had occurred in prior years or impacted prior rates. Nor did the memo mention or imply that fixing the HSA Errors under the Medicare Methodology would have resulted in significant reductions to the rates TMA paid the DPs in OP3 and earlier periods.

220. The first time either TMA or Kennell learned about the Prospective Error was when they received and read the June 27 Milliman memo.

221. The June 27 memo suggested that Milliman and Kennell work together to address the Filtering Error and Prospective Error in connection with the OP4 rate calculations. Aside from discussion of one specific issue, the memo did not contemplate any role for TMA to play in resolution of the two calculation issues. And, indeed, throughout the summer, Milliman worked directly with Kennell (not TMA) to fully address and resolve both the Filtering Error and Prospective Error in the OP4 SA calculations.

222. Later that day, after the Milliman memo had already been sent to TMA, there was a meeting of the Finance Committee. No one who represented St. Vincent's attended this particular Finance Committee meeting. Recollections differ about what was said, but some attendees claim that Steve Weiner orally conveyed during the meeting that the Plans were not overpaid due to the HSA Errors and that TMA had no legal right to reclaim money due to those errors. (Steve never communicated any legal advice regarding these topics to the Plans in writing, and the minutes from the June 27 Finance Committee meeting say nothing about these topics.)

*c. Defendants abandoned a proposal to highlight the decrease in rates between OP3 and OP4 because they feared this would also highlight the overpayments TMA had made in OP3 and earlier periods.*

223. Throughout the remainder of 2012, Defendants continued to limit their discussions with TMA to the new TFL Methodology and avoided any discussion that might alert TMA to the fact that the Designated Providers had been overpaid when the Medicare Methodology was used.

224. For example, at the June 27, 2012 Finance Committee meeting, a Vice President at Johns Hopkins suggested that Milliman prepare a slide for use at an in-person meeting the DPs had scheduled with TMA for July 11, 2012. Johns Hopkins' Vice President suggested that this

slide show the last few years of rates in the aggregate and highlight the significant drop in rates the DPs would experience in one year if the OP4 rates proposed by TMA were implemented. The Finance Committee's consensus was that creating this slide was a good idea, and development of a slide showing the impact of OP4 rates compared to past years was added as an "Action Item" for Milliman.

225. Just minutes after that Finance Committee call ended, however, Kirk Twiss—an actuary and consultant to Johns Hopkins who also joined the June 27 Finance Committee call—sent an email to Johns Hopkins' representatives on the Finance Committee with the subject line "comparison with prior ceiling rates." The body of that email read as follows:

I am not sure the question about comparing prior year's rates that were too high to the proposed rates was addressed fully. If we will be making the argument that the rate decrease is too big to absorb in one year, then I don't think we can dismiss the prior year's rate overstatement as TMA's problem. TMA could say the prior rates were overstated by 10%, so the proposed decrease of 10% is not too big. I think a better approach would be to say there are many assumptions that go into the ceiling rate calculations and actual experience could differ. Although the risk score calculation was an error not an assumption, there was no bias to the results (you wouldn't know how it would impact each plan unless you recalculated the risk scores), thus can be considered like an assumption for this discussion. Recalculating risk scores would be similar to revising trend in hindsight knowing the actual results. Then we can treat the prior rates as valid and the change from them for this year also would be a valid concern of the plans.
I think the memo from Milliman is fine.

226. Johns Hopkins forwarded Kirk's email to Steve and to the Alliance's Executive Director. Likely as a result of Kirk's observation, Defendants never presented this argument to TMA on July 11, and Milliman never even drafted the "significant drop" slide. Indeed, by the time of the July 11 meeting, the Alliance had decided that its official position at that meeting was to focus on trying to get the OP4 rates as high as possible and *not* to mention the DPs' concern about the steep drop in rates they were facing in OP4 as compared to prior years.

227. Upon information and belief, the DPs' official position for the July 11 TMA meeting was motivated by a concern that highlighting the drop in rates from OP3 (when the rates were overstated) to OP4 would bring the "prior year's rate overstatement" into focus (as Kirk

suggested), thereby increasing the risk that TMA would come to realize that there had been such an overstatement and take some action to recover the overpayments from the DPs.

*d. Defendants failed to say anything about the HSA Errors or their impact when TMA extended the OP3 rates for two months.*

228. The OP4 rate-setting discussions between Defendants and TMA were contentious and extended longer than usual. TMA was supposed to begin paying the OP4 rates to the Designated Providers on October 1, but it needed to have those rates finalized before October 1 to ensure it was prepared to begin paying the new rates on time. But, as August came to a close, the Parties still had not agreed on ceiling rates for OP4.

229. In mid-August, Steve explained to the Board of the Alliance, which contained a representative from each Plan, the options available to TMA if the Parties reached an impasse. One option was that TMA could extend the DPs' contracts (for up to six months), during which time the DPs would be paid at the OP3 rates. Steve also relayed that, although his law firm colleague disagreed, the Program Manager believed that at the end of any extension period, TMA could perform a "retrospective reconciliation" between the OP3 rates and OP4 rates, as it had in prior years when the rates were not finalized on time. *See* paragraph 237, *infra*. The Alliance's Executive Director communicated something similar to the Finance Committee.

230. Even after Defendants became aware of the possibility that TMA might continue to pay the Plans at the erroneous OP3 rates for several additional months, Defendants said nothing to TMA about the HSA Errors that had inflated the OP3 rates.

231. The Designated Providers sent TMA a letter asserting that the Parties had reached an impasse in their negotiations. In response, on August 31, unaware of the HSA Errors in the OP3 rates, the Contracting Officer extended the OP3 rates by two months to give the Parties additional time to conclude their discussions regarding the OP4 rates.

232. In mid-September, when providing an update to his boss, a representative for Brighton Marine explained that there would be an increase in projected revenue because "we got the government to delay the effective date of the [OP4] rates."

233. At no point either before or after the OP3 rates were extended for two months did any Defendant inform TMA that those rates contained the HSA Errors.

234. Not only did the Plans fail to inform TMA of the errors in the OP3 rates that were extended, but some Plans also made sure they would be paid at the improperly inflated OP3 rates for those extra two months. Indeed, some Plans demanded this as a condition of accepting the OP4 rates.

235. When describing this OP3 extension to her boss, a Vice President at Johns Hopkins (and one of Johns Hopkins's representatives on the Finance Committee) stated that it was not clear whether the Contracting Officer fully understood the financial implications of her decision. The Vice President recognized there was a chance TMA would take action to "back peddle" on the extension. But Johns Hopkins did not alert TMA that the OP3 rates it had just extended were improperly inflated due to the HSA Errors or otherwise take steps to make the Contracting Officer aware of the financial implications of her decision.

236. St. Vincent's representative on the Finance Committee expressed that he was encouraged by the extension, and even mused that it would be better to have the (erroneously inflated) rates extended for a total of six months, instead of just the two.

237. In prior years, when the rates were not finalized by the time the Plans submitted their first invoices for the start of a new period (which they typically did 45 or more days before the start of that period), the Plans would continue invoicing TMA at the old rates, TMA would pay those invoices, and then, when the new rates were finalized, TMA would adjust the

payments to the DPs during the regular reconciliation process. Typically, the rates increased year to year. Thus, in those instances, the Plans were happy to accept the increased payments from TMA as part of the reconciliation process. By the fall of 2012, however, it was clear that the OP4 rates were going to be lower than the OP3 rates had been. Notably, once the OP4 rates were finalized, Johns Hopkins and Brighton Marine only agreed to accept the proposed OP4 rates if those rates became effective on December 1, 2012 (i.e., if TMA continued to pay these Plans the erroneous OP3 rates for the full duration of the two-month extension, without any adjustment in TMA's favor).

238. Shortly thereafter, PacMed and St. Vincent's also accepted the proposed OP4 rates, effective December 1, 2012. PacMed's acceptance was expressly described as acceptance of a "Proposed Economic Package" that included the two-month extension of the OP3 rates that PacMed knew contained the HSA Errors. Neither PacMed nor St. Vincent's took any action to make TMA aware that it was going to be overpaying them for those two additional months.

*e. Defendants failed to correct TMA when it asserted that there had not been any significant actuarial validity issues in OP3 or earlier periods.*

239. Defendants also failed to correct the Contracting Officer, or in some instances to even respond, when she made statements demonstrating she did not understand that the HSA Errors had impacted prior rates or that those errors caused the Designated Providers to be overpaid.

240. On or around September 10, TMA sent letters to Brighton Marine and Johns Hopkins as part of the ongoing rate discussions. The third point in those letters related to the "health status adjustments that have been applied to the ceiling rates in previous years" and the CMS Model. The letters stated that "[t]o our knowledge, there have not been any significant actuarial validity issues raised by the plans in applying the results of [the CMS Model] in the

calculation of the ceiling rates in previous option periods." A copy of Brighton's letter was shared with all members of the Finance Committee, and this same language later appeared in letters or emails TMA sent directly to other DPs.

241. These statements reflected that TMA did not understand that the Filtering or Prospective Errors had any application to prior option periods or that those errors called into question the validity of any prior rates. The statements also strongly suggested that TMA was not, in fact, aware of the HSA Errors or any other "significant actuarial validity issues" with how prior HSAs had been calculated.

242. After Brighton Marine and Johns Hopkins received the September 10 letters, Defendants discussed the responses these two DPs ultimately sent to TMA. Brighton Marine and Johns Hopkins responded to TMA's letters by eliding the "third" point in those letters and arguing that the CMS Model was used in the past because published Medicare scores calculated using that model were part of the rates. In other words, the communications from Brighton Marine and Johns Hopkins *did* include responses to the "third" point in TMA's September 10 letters, but those communications were misleading because they did not alert TMA to the fact that the HSA Errors *had* raised significant actuarial validity issues with respect to the calculation of the ceiling rates in previous option periods (i.e., they did not correct TMA's apparent misunderstanding about the actuarial validity of the HSAs used for OP3 and earlier periods). Brighton Marine and Johns Hopkins sent their responses to TMA only after all Defendants were informed of, and agreed to, the language that would appear in these responses.

243. The other DPs that received communications from TMA containing the same "third" point either made similarly misleading statements to TMA or did not respond to TMA at

all—a reaction that itself is misleading, especially in the context of those DPs' subsequent communications with TMA.

> *f. During their individual negotiations, Christus and Martin's Point encouraged TMA to pay them at the inflated OP3 rates for another full year without disclosing to TMA that those rates were erroneously inflated.*

244. As discussed above, not long after the OP3 rates were extended by two months, four of the Designated Providers accepted the OP4 rates being proposed by TMA. Two of the Designated Providers—Christus and Martin's Point—however, continued to engage in discussions with TMA about the OP4 ceiling rates. In those individual conversations, Christus and Martin's Point continued to conceal the impact the HSA Errors had on the rates paid in OP3 and earlier periods. And, despite the fact that the other Plans were not directly involved in these conversations, Christus and Martin's Point informed the other members of the Alliance of the arguments they each were making to TMA and the positions they were taking in these individual negotiations.

245. During those discussions, both Plans complained about the large decrease in rates between OP3 and OP4, even though they knew the OP3 rates had been inflated by the HSA Errors. Each suggested that the Medicare Methodology, as it was used to calculate the OP3 rates (i.e., with the HSA Errors), was actuarially sound and could be used again for OP4 (without any changes to the HSA), even though both Christus and Martin's Point knew by this time that the OP3 rates were flawed and the Medicare Methodology could only be used again if the HSA Errors were corrected.

246. In its individual exchanges with TMA, Martin's Point complained that it was very concerned about the proposed switch to the TFL Methodology because it would result in "dramatically lower" rates for OP4. For example, in one letter, Martin's Point stated that it was

important that it "be assured that the rates are based on an actuarially sound methodology and reasonably established." In that same letter, Martin's Point then asserted that the "fair and reasonable approach" would be to revert back to the Medicare Methodology, as it was the last approach agreed to by the Parties and this methodology had been found actuarially sound. Martin's Point's letter emphasized that the rates needed to be "fair, reasonable, and transparent." But, in that letter, Martin's Point made no mention of the fact that it had learned that the Medicare Methodology had not in fact been executed in an actuarially sound manner in OP3 and earlier periods. Nor did the letter discuss updating the HSA or fixing the HSA Errors if the Medicare Methodology was used again. And in fact, in that same letter, Martin's Point proposed rates that were calculated using the OP3 HSA, which by this time Martin's Point knew was erroneously inflated due to the HSA Errors.

247. Christus had similar exchanges with TMA. In one such letter, Christus stated that it was struck by the huge discrepancy between the rates calculated using the Medicare Methodology and the TFL Methodology and asked TMA to justify the change in methodology, even though Christus knew by this point that the HSA Errors explained much of the discrepancy. In another, Christus pointed out that, as a result of the shift to the TFL Methodology, the ceiling rates were going to decrease by eighteen percent. Christus claimed that this decrease was "suspect on its face," even though Christus knew that, in large part, the decrease occurred because the HSA Errors had improperly inflated the rates in the past (and led to Christus's [redacted] profit margins on its USFHP plan). Christus continued to state that TMA had no basis for considering the Medicare Methodology to be unsound for OP4, because the methodology had been found to be actuarially sound before. Christus also suggested that it would be reasonable

for TMA to continue paying the OP3 rates, despite Christus knowing by this time that there were significant actuarial flaws in those rates.

* * *

248. Neither Defendants, nor anyone from Milliman or Mintz, nor anyone else acting on behalf of Defendants acknowledged in any communications with TMA in 2012 (or in any year thereafter) that they knew (or had reason to believe) that either the Filtering Error or Prospective Error affected the ceiling rates paid for OP3 or for any earlier period. Indeed, neither Defendants, nor anyone from Milliman or Mintz, nor anyone else acting on behalf of Defendants so much as notified TMA that there was a potential issue with the OP3 ceiling rates so an open discussion of the issue and any possible remedies could be discussed.

249. Neither Defendants, nor anyone from Milliman or Mintz, nor anyone else acting on behalf of Defendants told TMA what they knew about the HSA Errors' impact on the ceiling rates paid for OP3 and earlier periods. For example, they never told TMA that fixing the two errors decreased rates when the Medicare Methodology was used, even though fixing the errors increased rates when the TFL Methodology was used. *See* paragraphs 178, 179, 182-184, *supra*. Nor did Defendants, Milliman, or Mintz say anything to TMA about how the HSA Errors would impact rates if the Medicare Methodology were used again in OP4.

250. Neither Defendants, nor anyone from Milliman or Mintz, nor anyone else acting on behalf of Defendants notified the Contracting Officer (or anyone else at TMA) that the government had overpaid the Designated Providers in OP3 or earlier periods due to the HSA Errors (or even that the rates paid in OP3 and earlier periods were higher than they would have been if the HSA Errors had not been made).

251. None of the Designated Providers, nor anyone else acting on their behalf, returned any of the overpayments they received due to the HSA Errors to TMA or requested instructions from TMA for disposition of any overpayment.

**ii. Kennell, TMA's Actuarial Consultant, Also Did Not Tell TMA About the Historic HSA Errors, Their Impact, or the Resulting Overpayments.**

252. It was against Kennell's interest to inform TMA that it had made the HSA Errors. Kennell had been making the HSA Errors for years and years, costing the government hundreds of millions of dollars (money that TMA would not have paid to the DPs in the absence of Kennell's inexcusable errors). TMA was Kennell's biggest client—and had been since Kennell's founding—and virtually all of Kennell's clients since its founding have been government entities.

253. Similar to Defendants' communications with TMA, Kennell's communications were inadequate to inform TMA that it had been dramatically overpaying the Plans for years. In its oral and written communications with TMA, Kennell did not describe the Filtering Error or Prospective Error as "errors" or "mistakes." Similar to Defendants, Kennell discussed the need to filter claims and run the CMS Model prospectively only when communicating with TMA about *the TFL Methodology* as it would be used *for OP4*. Kennell never explained that it had also made the HSA Errors when using the Medicare Methodology in OP3 and earlier periods, nor did Kennell explain the impact of those errors on the rates paid to the plans in OP3 and earlier periods or the overpayments that resulted from those errors. Indeed, several of Kennell's communications with TMA affirmatively obscured these key facts.

254. Kennell did not describe the need to filter claims or run the model prospectively as changes that needed to be made to fix an error or mistake. Instead, Kennell repeatedly used euphemisms when referring to the Filtering and Prospective Errors. Kennell referred to the

errors as "technical issues," thus minimizing their significance. And instead of referring to the HSAs and SAs they calculated after correcting the Filtering and Prospective Errors as ones that were now fixed or corrected, Kennell referred to such HSAs and SAs as ones that had been updated, revised, refined, recalculated, or adjusted. This language not only failed to signal the existence of any past errors or mistakes, but it also left TMA with the impression that the changes Kennell was making to the HSAs and SAs throughout 2012 were routine, akin to the types of updates and refinements that occurred each year.

255. Kennell also always discussed the Filtering Error and Prospective Error as they concerned the TFL Methodology being used in OP4. Kennell never told TMA that these two errors had been made when calculating the rates for OP3 and earlier periods. In fact, Kennell's communications gave the impression that neither the Filtering Error nor the Prospective Error had impacted the Medicare Methodology.

256. Because Kennell never even informed TMA that it had been making the HSA Errors in OP3 and earlier periods, it follows that Kennell also failed to explain to TMA that the HSA Errors caused rates developed using the Medicare Methodology to be overstated.

257. Kennell's failure to inform TMA about the nature, scope, and impact of the HSA Errors in OP3 and earlier periods is exemplified by its communications with the Program Manager in April of 2012, after Kennell had learned of the Filtering Error (but before it learned of the Prospective Error).

258. On April 10, Kennell had a call with the Program Manager. On that call, Dave and Geof informed the Program Manager that they would need more time to prepare the OP4 Selection Adjustments (and accompanying SA memos) as a result of the guidance about excluding claims (i.e., filtering) raised by the TMA analyst on the April 4 call, *see* paragraph

147, *supra*. This portion of the April 10 call focused only on the proposed OP4 rates being developed using the TFL Methodology and the related SAs; nothing was said about the HSAs used for OP3 and earlier periods, and neither Dave nor Geof used the word error or mistake. (Dave and Geof believe that one of them said something on the April 10 call that they thought may have caused the Program Manager to understand that Kennell had not been filtering out the excluded claims when calculating the HSAs used in OP3 and earlier periods. But they are wrong. The Program Manager never had this understanding.)

259. On that April 10 call, Dave and Geof also discussed a paper Kennell had prepared in response to a question from the Senate Armed Services Committee inquiring about USFHP costs compared to TMA's military health system costs. That is significant because the response Kennell had prepared for the Senate Armed Services Committee predicted that the USFHP rates would decrease between OP3 and OP4—not because Kennell planned to fix any error, but rather because of the switch to the TFL Methodology. The paper acknowledged that the USFHP rates were 29 percent higher than average costs for TFL beneficiaries; stated that the "key reason" the USFHP rates were so much higher than the average TFL costs was that the USFHP rates were based on Medicare data, as opposed to TFL data; and predicted that switching from the Medicare Methodology to the TFL Methodology would lead to lower rates. The response made no mention whatsoever of the Filtering Error or its role in inflating the USFHP rates in the past, and neither Dave nor Geof recalls discussing the Filtering Error with the Program Manager in relation to that draft response.

260. Even if the Program Manager had been left with the impression after April 10 that the Filtering Error had impacted OP3 and earlier periods—which she had not been—such an impression would have been undone just days later. On April 20, Kennell sent the Program

Manager a memo purporting to describe the changes Kennell would make to the ceiling rates for OP4. The purpose of the memo was to help the Program Manager explain to her bosses why the ceiling rates were expected to decrease between OP3 and OP4, in case they asked. The portion of the memo discussing the 65-and-over rates contained two sections. The first section described how much the ceiling rates would decrease if Kennell used the Medicare Methodology to develop the OP4 rates and listed several factors contributing to the decrease. This first section of the memo made no reference whatsoever to revising the HSA in any way (and thus it did not quantify the impact of fixing the HSA Errors). The second section of the memo described how much further the rates would decrease if Kennell used the TFL Methodology to develop the OP4 rates. In this second section, the memo concluded that rates developed using the TFL Methodology would decrease, in part, because of "revised methods of measuring health status of the USFHP and non-USFHP populations."

261. This memo was insufficient to inform a reader about the Filtering Error's existence. The memo's brief reference to "revised methods of measuring health status" was vague and misleading. The memo did not explain precisely what needed to be revised (or why), and it provided no description of (or any allusion to) either the Filtering Error or Prospective Error (nor could it have said anything about that latter error, as Kennell had not yet become aware of its existence). The memo also did not indicate that the change was being made to correct an error; rather, the memo downplayed the significance of this change by labeling it a revision.

262. Additionally, the memo was insufficient to inform a reader about the impact of the Filtering Error on the rates paid to the Plans for OP3 and earlier periods. The first section of the memo (discussing the changes that would need to be made if Kennell were to use the

Medicare Methodology again) said nothing whatsoever about "revised methods of measuring health status," let alone anything about needing to revise or recalculate the HSAs if the Medicare Methodology were to be used again. By mentioning the need to revise the SAs in the section of the memo describing the TFL Methodology, but not the need to revise the HSAs in the section discussing the Medicare Methodology, the memo implied that any revisions only needed to be made when using the TFL Methodology, and not when using the Medicare Methodology. Finally, Kennell failed to quantify the impact of revising the HSAs when using the Medicare Methodology (such a quantification would have revealed that the Filtering Error had grossly overstated the ceiling rates in OP3 and earlier periods).

263. The Program Manager did not come away from the communications related to the April 20 memo (or any other communications in 2012) with the understanding that Kennell had made the Filtering Error in OP3 and earlier periods, let alone that this error had *inflated* the resulting ceiling rates in OP3 and earlier periods. Rather, her understanding throughout 2012 was that the decrease in the ceiling rates between OP3 and OP4 was the result of the switch to the TFL Methodology, not the result of correcting any prior error.

264. Kennell did not learn about the existence of the Prospective Error until June 27, 2012, thus it could not have said anything to TMA about this error in April. *See* paragraph 220, *supra*. Moreover, in 2012, Kennell did not fully understand the impact the Prospective Error had on ceiling rates developed using the Medicare Methodology. Indeed, Kennell did not fully fix the Prospective Error when calculating the SAs in 2012. As a result, in 2013, when Kennell was updating the SAs, it continued to ask Tim Wilder questions about how to properly run the CMS Model prospectively. At one point, Tim remarked to representatives from Brighton Marine and Johns Hopkins, as well as the Alliance's Executive Director, that he was not sure what else to tell

Kennell, other than "do it the correct way!" Consequently, it would have been impossible for Kennell to accurately and completely explain the scope of the Prospective Error or its impact to TMA, as Kennell did not fully understand that error in 2012.

265. Kennell's failure to explain the impact of the HSA Errors on past rates persisted throughout 2012. As a result of Martin's Point's zealous advocacy, *see* paragraph 246, *supra* and paragraph 281, *infra*, Kennell was tasked with calculating an OP4 rate for Martin's Point using the Medicare Methodology. Instead of explaining to TMA that it was correcting errors in the HSA that had been calculated for OP3, Kennell informed TMA that it was recalculating Martin's Point's HSA because it was an "out-of-date measurement." Kennell's language did not indicate to TMA that the previous HSA was incorrect, erroneous, or flawed. That is especially true because, when it recalculated the rates each year, Kennell often used updated data and made tweaks or slight refinements to the methodology—moving from one actuarially valid approach to another (arguably better) actuarially valid approach. Moreover, when it updated the HSAs, Kennell often did so in order to use more up-to-date data.

266. At no point did anyone at Kennell inform the Contracting Officer, Program Manager, or anyone else at TMA that either or both of the HSA Errors had caused the HSAs, and the resulting ceiling rates, to be overstated in the Base Period, OP1, OP2, or OP3.

267. At no point did anyone at Kennell inform the Contracting Officer, Program Manager, or anyone else at TMA that the government had overpaid the Designated Providers for years because of the HSA Errors.

#### iii. At No Point Prior to the Filing of this *Qui Tam* Did TMA Know About (Or Even Suspect) That the HSA Errors Had Impacted Past Rates and Resulted in Overpayments.

268. At no point prior to August 2016 did anyone at TMA (or anyone else in the government, for that matter) understand that the HSA Errors had affected the ceiling rates for

OP3 and earlier periods; that the HSA Errors had caused the ceiling rates to be in violation of the material requirements and improperly inflated in those periods; or that the government had overpaid the Designated Providers for years because of the HSA Errors.

269. Statements made by Defendants and Milliman did not alert TMA to the impact the HSA Errors had on the ceiling rates developed under the Medicare Methodology. All of Defendants' and Milliman's communications were focused on OP4 and the TFL Methodology. There was nothing in those communications that stated, suggested, or even hinted that any errors discussed in the context of the TFL Methodology also had been made in the past when the Medicare Methodology was used. *See* Section V.F.i., *supra*.

270. Similarly, Kennell's communications did not alert TMA to the impact the HSA Errors had on the ceiling rates developed under the Medicare Methodology. Kennell's communications only discussed the impact of the Filtering Error and Prospective Error in the context of the TFL Methodology. Kennell never explained to TMA that it also had made those same errors when it was using the Medicare Methodology to calculate rates in OP3 and earlier periods. Nor did Kennell ever inform TMA of the impact the HSA Errors had on the ceiling rates developed using the Medicare Methodology. Kennell never even described the Filtering or Prospective Errors as errors or mistakes. As a result, Kennell's oblique references to the need to filter claims or run the CMS Model prospectively in OP4 did not raise any red flags at TMA about the validity of the ceiling rates in OP3 or earlier periods or cause anyone at TMA to question whether past rates violated any of the material requirements or were improperly inflated. *See* Section V.F.ii., *supra*.

271. And TMA never discovered the HSA Errors on its own, nor should it have been expected to do so. TMA appropriately relied on its consultants at Kennell to raise and explain

significant actuarial issues that arose regarding the rate-setting process and to promptly notify it if an error had caused past ceiling rates to be improperly inflated or in violation of any of the material requirements. And it expected Defendants to make truthful, accurate, complete, and non-misleading statements to it during the rate-setting process and to promptly notify it if an error had caused past ceiling rates to violate a material requirement or to be improperly inflated (as well as to comply with all contractual provisions and FAR provisions incorporated in the USFHP Contracts, including 48 C.F.R. § 52.212-4). Nothing that Kennell or Defendants said or wrote caused TMA to understand or infer that the HSA Errors had impacted the ceiling rates TMA paid the Plans in OP3 or earlier periods.

272. The substantial decrease in the ceiling rates between OP3 and OP4 also did not alert TMA to the HSA Errors or the fact that the rates had been overstated in OP3 and earlier periods. Before the HSA Errors were discovered, Kennell had repeatedly informed the Contracting Officer, Program Manager, and others at TMA that it expected the rates to decrease in OP4 because of the switch from the Medicare Methodology to the TFL Methodology. Kennell never corrected or supplemented this explanation after it learned of the HSA Errors. Indeed, throughout 2012, Kennell continued to attribute the decrease in rates to the switch to the TFL Methodology and never attributed the decrease to the HSA Errors, which had improperly inflated the rates in OP3 and earlier periods. *See* paragraph 280, *infra*.

273. In sum, no one ever informed TMA that the rates calculated using the Medicare Methodology in OP3 and earlier periods contained the HSA Errors. Or that the HSA Errors resulted in ceiling rates that were in violation of any of the material requirements. Or that the ceiling rates paid to the Plans in OP3 and earlier periods were improperly inflated or higher than they would have been absent the errors. Or that fixing those errors was the major reason for the

significant decrease in ceiling rates between OP3 and OP4. Or that the HSA Errors had resulted in HSAs (and thus ceiling rates) that were not calculated consistent with the Parties' intent or understanding.

274. If an error had been made in the past—especially one that resulted in rates that violated the material requirements and had cost TMA millions of dollars—the Contracting Officer and Program Manager would have expected Defendants and Kennell to promptly communicate to TMA what had happened in clear, detailed, and unequivocal terms. The Contracting Officer and Program Manager similarly would have expected Defendants and Kennell to promptly inform TMA if and when they realized any of the facts described in paragraph 273.

275. If either the Contracting Officer or Program Manager had been told any of the facts in paragraph 273, they would have recalled such a disclosure. Neither the Contracting Officer nor Program Manager recalls such a disclosure from Kennell. Neither individual recalls such a disclosure from Defendants or anyone acting on their behalf. And, prior to August 2016, neither individual recalls such a disclosure from anyone else.

276. If either the Contracting Officer or Program Manager had been told any of the facts in paragraph 273, they also would have taken some action. The Contracting Officer and Program Manager never took any action.

#### iv. Defendants Were Acutely Aware of TMA's Ignorance and Took Steps to Maintain It.

277. Not only was TMA unaware that the HSA Errors impacted prior rates, but Defendants knew this. TMA's actions, as well as its communications with Defendants, demonstrated that TMA was unaware of the impact of the HSA Errors.

278. For example, as discussed in paragraphs 202-243, *supra*, Defendants took great pains not to inform TMA of the existence of either the Filtering Error or Prospective Error in the Medicare Methodology or the impact of either error on the HSAs used for (or ceiling rates paid in) OP3 and earlier periods. Such caution would not have been necessary if Defendants believed that TMA knew that the HSA Errors had improperly inflated the rates for OP3 and earlier periods.

279. As discussed in paragraph 240, *supra*, in September 2012, TMA sent Brighton Marine a letter stating that it was unaware of any actuarial validity issues raised by the Plans in using the results of the CMS Model to calculate rates in prior option periods. That letter to Brighton Marine was shared with all Defendants, and TMA sent letters containing that same language to several other DPs directly. This statement put all Defendants on notice that TMA was unaware that the HSA Errors impacted rates calculated using the Medicare Methodology.

280. Later in September, PacMed asked TMA to provide it with an estimate of how much TMA expected the ceiling rates to be adjusted or change in the future. In response to this request, on September 26, TMA shared with PacMed a memo prepared by Kennell. In this memo, Kennell stated that there were three primary reasons the rates decreased from OP3 to OP4. Kennell identified the use of TFL data to calculate the rates as the biggest reason for the decrease. It also stated that a small part of the decrease was due to the use of a Selection Adjustment. The memo says nothing about the HSA Errors. It does not explain or acknowledge that the HSA Errors had inflated the OP3 rates, or that the decrease in rates from OP3 to OP4 was due to the fact that Kennell was no longer making the HSA Errors. This memo—which purported to explain the primary reason for the decrease in rates between OP3 and OP4 but said

nothing about the HSA Errors—should have put PacMed on notice that TMA remained unaware of the HSA Errors or their impact on the rates it had been paid in OP3 or earlier periods.

281. And, in November 2012, TMA made statements to Martin's Point that should have put it on notice of this as well. As discussed in paragraphs 245-246, *supra*, Martin's Point suggested that TMA calculate its OP4 rates using the Medicare Methodology and the OP3 HSA. Instead of telling Martin's Point that it could not adopt its suggestion to use the OP3 rates again because of the HSA Errors, TMA simply noted that the OP4 approach was superior in a number of ways and was more consistent with the NDAA. When TMA finally acquiesced to Martin's Point demand that it once again use the Medicare Methodology, TMA sent Martin's Point letters describing how it had arrived at an OP4 rate for Martin's Point. Those letters did not ever mention "fixing" or "correcting" the HSA Errors. Instead, TMA stated it could not use the rates proposed by Martin's Point because they used an "out-of-date measurement of the HSA." TMA described Martin's Point's OP4 HSA as having been "recalculated." These communications put Martin's Point on notice that TMA had not fully understood the nature or impact of the HSA Errors.

282. TMA also conspicuously failed to make the kinds of statements that it would have made had it known that the HSA Errors caused prior rates to be inflated. These omissions put Defendants on notice that TMA did not understand the impact of the HSA Errors.

283. For example, for OP4, TMA continued to propose switching to the TFL Methodology and never suggested returning to the Medicare Methodology. If TMA understood the impact of fixing the HSA Errors on the OP3 rates or if it had seen the kind of analysis prepared by the Plans' actuary, *see* paragraphs 177-182, *supra*, it would have recognized that the Medicare Methodology (with the HSA Errors fixed) produced lower OP4 rates than the TFL

Methodology for five of the six Plans. Yet TMA never suggested to the Plans that it continue using the Medicare Methodology for the OP4 rates.

284. Additionally, during the OP4 rate discussions, when Christus and Martin's Point complained about the decrease in rates between OP3 and OP4, *see* paragraphs 245-247, *supra*, TMA never responded to those complaints by pointing out that the OP3 rates had been overstated due to the HSA Errors.

285. Nor did TMA ever try to use the past overpayments as leverage during the OP4 negotiations to argue against adopting positions advanced by the Designated Providers. In addition, TMA never mentioned doing any reconciliation, offsets, or otherwise recouping from the Designated Providers any of the overpayments that resulted from the HSA Errors.

286. In fact, as discussed in paragraph 231, *supra*, at the end of August, TMA extended the improperly inflated OP3 rates for an additional two months. At the time, Johns Hopkins observed that it was not clear whether the Contracting Officer fully understood the financial implications of extending the OP3 rates for two months. *See* paragraph 235, *supra*. Johns Hopkins's observation was accurate. If TMA had known that the OP3 rates were inflated due to the HSA Errors, it would not have paid those rates for an additional two months.

287. All of these facts, *see* paragraphs 279-286, *supra*, also support the inference that Defendants knew *Kennell* had not told TMA about the impact the HSA Errors had on prior rates.

288. Defendants knew that Kennell did not always inform TMA about all of the changes being made to the rates, especially if those changes were technical or complex. *See* paragraph 310, *infra*. Defendants also knew that it was against Kennell's interest to inform TMA that Kennell had been making the HSA Errors. Defendants knew that Kennell had been making the HSA Errors for years and that there was no excuse to justify calculating the HSAs

with these errors. Defendants also knew that the HSA Errors had caused TMA to substantially overpay the Designated Providers. Some DPs also were aware that TMA was Kennell's biggest client. The only reasonable conclusion from these facts is that it was not in Kennell's interest to inform TMA that it had made mistakes that could jeopardize its relationship with its largest client.

### G. Had TMA Been Aware of the HSA Errors and Their Impact, TMA Would Not Have Paid the Plans at the Improperly Inflated Ceiling Rates and Would Have Taken Steps to Recoup Any Overpayments.

289. If TMA had been aware that the HSA Errors had inflated past ceiling rates, then TMA would have had the opportunity to exercise one of the various legal remedies available to it in order to recoup the hundreds of millions of dollars it had overpaid the Designated Providers. For example, TMA could have withheld the amount of the overpayments from future payments to the DPs until the overpayments were recouped. And if TMA had been aware that the HSA Errors had inflated ceiling rates it was currently paying the Plans, then it would have stopped paying those inflated rates.

290. In fact, after the government eventually learned of the HSA Errors (via the filing of relators' *qui tam* complaint), it opened an investigation into Kennell & Associates. As a result of that investigation, the United States and Kennell settled claims arising from allegations that Kennell made errors in calculating the rates. As part of this settlement, Kennell agreed to make a series of financial payments to the United States in an amount that, according to a qualified expert, is likely the maximum Kennell has the ability to pay.

#### i. TMA Was Not Legally Permitted to Pay Rates That Violated the USFHP Program's Governing Statute and Would Not Have Paid Rates That Violated the Health Comparison Requirement.

291. TMA would have treated the HSA Errors, which were truly mistakes and ones that resulted in rates that violated the material requirements, differently than other routine changes that were made to the rates year-to-year.

292. TMA recognized that an error in executing the agreed-upon ceiling rate methodology was distinguishable from making a deliberate change in the methodology because of changes to the Medicare or TRICARE program or in an effort to improve the methodology.

293. TMA also recognized that an error in executing the ceiling rate methodology was distinguishable from the use in that methodology of an actuarially sound assumption (e.g., an assumption that health care costs would rise at a rate of 2 percent per year based on data suggesting that was a reasonable assumption) that did not ultimately match the actual experience (e.g., if it turned out health care costs rose at 1 or 3 percent in a particular year instead).

294. The HSA Errors caused the ceiling rates TMA paid to the DPs in the Base Period, OP1, OP2, and OP3 to exceed the statutory limit and violate the actuarial soundness requirement. TMA was not legally permitted to pay the DPs at rates that violated the statute, i.e. at rates that exceeded the limitation set forth in Section 726(b) or were not actuarially sound.

295. Defendants were aware that Section 726(b) specified that the ceiling rates could not exceed the costs the government would have incurred if the USFHP beneficiaries had received their care through Medicare or TRICARE. Additionally, Defendants were also aware that the NDAA required that the ceiling rates be actuarially sound. In fact, Defendants would regularly cite or allude to these requirements when explaining to TMA why it needed to adopt or reject proposed changes to the ceiling rate methodology.

296. The HSA Errors also caused the ceiling rates to violate the health comparison requirement. TMA would not have paid rates that were in breach of Section 9.2.2.3.e of the USFHP Contracts or that were not consistent with the Parties' intent and understanding regarding calculation of the HSAs.

297. Violations of the material requirements that caused TMA to overpay the DPs by hundreds of millions of dollars were significant; they were not minor or insubstantial.

**ii. When TMA Had Knowledge of Other Errors or Violations of Material Requirements, It Took Action to Remedy Them.**

298. In fact, shortly before the USFHP Contracts at issue in this litigation took effect, both TMA and Defendants learned of other errors that impacted already agreed-to ceiling rates. When those other errors caused the ceiling rates to violate a material requirement, TMA took corrective action, including recouping money from the DPs.

299. Significantly, many of the same individuals who worked for Defendants in 2012, when the HSA Errors came to Defendants' attention, were also personally involved in resolving the errors described below. Thus, Defendants were aware that TMA could and would take action to correct errors and recoup money from the DPs when it discovered errors that had caused (or could cause) the DPs to be overpaid.

*a. Health Net*

300. Health Net Federal Services, Inc. is another TMA contractor. In the early 2000s, Health Net was responsible for processing and paying managed care claims on behalf of TRICARE for beneficiaries who lived in TRICARE's "North Region" and who were not enrolled in the USFHP program.

301. In 2004 and 2005, as a result of an unintentional administrative error, Health Net was mistakenly billed for (and then processed and paid) healthcare claims for USFHP

beneficiaries who were under 65 years old. Those claims should not have been billed to, or paid by, Health Net; instead, the claims should have been paid by the Designated Providers in the North Region (Brighton Marine, Johns Hopkins, Martin's Point, and St. Vincent's). The ceiling rates TMA paid to those DPs were calculated and paid to cover the cost of that care.

302. Thus, as a result of HealthNet's error, TMA essentially paid for this care twice: once via the ceiling rates it paid to those four Designated Providers and a second time via the erroneous payments made by Health Net (using TMA's funds). Additionally, the claims paid by Health Net were included in ceiling rate calculations for the 2007-2008 under-65 ceiling rates paid to all six of the DPs, even though those claims should not have been included.

303. This Health Net error, however, only came to light after the ceiling rates for the 2007-2008 time period had been finalized, the contract modifications had been signed, and those 2007-2008 rates had taken effect and had resulted in payments to the North Region DPs.

304. In February 2008, TMA informed Brighton Marine, Johns Hopkins, Martin's Point, and St. Vincent's of the erroneous Health Net payments and demanded that the Designated Providers reimburse TMA.

305. As the four Designated Providers considered how to respond to TMA, they discussed this issue during Finance Committee meetings. During those discussions, Tim Wilder acknowledged that the erroneous Health Net payments had impacted the ceiling rates for the 65-and-under beneficiaries. Tim recognized that, to determine the impact of this error, the government would need to recalculate the ceiling rates after removing the Health Net claims and then would need to use those revised figures to calculate an overpayment.

306. Ultimately, Brighton Marine, Johns Hopkins, Martin's Point, and St. Vincent's each settled this dispute with TMA. The settlement agreements signed by these four DPs

specifically stated that the ceiling rates were not being adjusted. Nevertheless, those four DPs agreed to repay a total of almost one million dollars to TMA.

*b. Re-aging*

307. In 2008, TMA changed the start of its fiscal year, and thus the start of the rate-year, from June 1 to October 1. In order to implement this change, TMA and Defendants agreed to calculate "gap" ceiling rates that would be paid between June 1, 2008 and September 30, 2008, until the next USFHP Contracts—the ones at issue in this matter—went into effect.

308. To develop these gap ceiling rates, the Parties agreed to start with the rates used during the June 1, 2007 to May 31, 2008 time period and make a number of adjustments. One such adjustment was to account for the fact that the DPs' beneficiaries would have gotten one year older since the ceiling rates were last calculated.

309. To account for this, Defendants and Kennell recognized that Kennell could either apply an "aging factor" to the rates or TMA's data contractor could "re-age" the population (for example, a 69-year-old person would be moved into the 70-74 age band and the DP would be paid at the ceiling rate assigned to that age-gender band for that person, as opposed to the rates for the 65-69 band). Either of these options could be used; but not both. Implementing both fixes would result in the beneficiaries' increased ages being accounted for twice.

310. Dave Kennell and Defendants' actuary from Milliman discussed these two options and agreed that some age adjustment would need to be made. Dave asked the actuary to send him an email regarding that issue. But Dave suggested that Milliman not copy TMA on this email because TMA would not understand the issue and Dave could handle it himself.

311. Dave ultimately chose the first of these options, i.e., he applied an aging factor, and this decision was communicated to the Plans. But Dave failed to clearly communicate this

decision to the Program Manager, so she instructed the TMA data contractor to re-age the population as of June 1, 2008.

312. The gap ceiling rates were finalized in May 2008. Brighton Marine's contract modification incorporating those rates was signed in late May with an effective date of May 30, 2008, and, upon information and belief, the other Plans' contract modifications were signed and took effect on or around that same date.

313. On June 10, 2008, the Finance Committee Chair, a Steward Vice President, realized that Brighton Marine's USFHP population had been re-aged as of June 1, even though Kennell had used an aging factor to develop the gap ceiling rates. Actuaries at Milliman confirmed that either an aging factor should have been used or the beneficiary population should have been re-aged, but both of these steps should not have been taken.

314. This issue was discussed by Defendants at the next Finance Committee meeting. The Finance Committee Chair suggested that the DPs bring this issue to TMA's attention, and the other members of the Finance Committee agreed.

315. Once this issue was brought to the Program Manager's attention, she agreed it needed to be corrected. She agreed with the Finance Committee Chair to correct it by undoing the re-aging of the beneficiaries.

316. But, in their discussions, the Finance Committee Chair and the Program Manager both acknowledged that they could instead have fixed this issue by correcting the DPs' ceiling rates. No one suggested that the rates could not be corrected to remedy an error, let alone that such a correction could not take place simply because the contract modifications had already been fully executed.

### H. The Plans Retained Overpayments and Submitted False Claims.

317. As a result of the foregoing, by June 2012, the Designated Providers knew that the ceiling rate payments they had been receiving since October 2008 were inflated because of the HSA Errors. Notwithstanding this knowledge, the Designated Providers did not report or return any of the overpayments they received between October 2008 and June 2012.

318. In addition, between June 2012 and November 2012—when the erroneous OP3 rates remained in effect while the rate discussions for the upcoming year continued—the DPs continued to submit claims to TMA for payment at these inflated rates even though they had become aware that the rates they were being paid were improperly inflated.

319. Each invoice (submitted on DD Form 250 and sent to DPInvoices@tma.osd.mil) identified the TMA contract number under which it was being submitted (e.g., H94002-09-C-0001, which was Brighton Marine's USFHP Contract number) and included, among other information, the name of the Designated Provider, the month and year for which the invoice was being submitted (e.g., September 2012), and the total amount the Designated Provider claimed it was entitled to be paid for insuring its USFHP beneficiaries for the specified month and year.

#### i. The Plans Retained Overpayments

320. By June 11, 2012, at the latest, the Designated Providers learned that the HSA Errors had caused the ceiling rates for the Base Period, OP1, OP2, and OP3 to be overstated. At no point after June 11, 2012, did the DPs take any actions whatsoever to report or return to TMA any of the overpayments they had received. Instead, the DPs combined, conspired, and agreed not to disclose the overpayments they had received in prior periods.

321. Prior to June 11, 2012, each DP submitted monthly invoices to TMA under its USFHP Contract seeking payment for the beneficiaries enrolled in their Plans. TMA paid each of these invoices, and the DPs received and retained those invoice payments. All of these

invoices sought payment at ceiling rates that contained the HSA Errors. Thus, all of the invoices sought payment at ceiling rates that were improperly inflated. Each of these invoices was eventually paid by TMA. The Designated Providers received and retained these invoice payments.

322. The Designated Providers agreed to take no action, and took no action, to rectify the fact that they had sought and received payments from TMA that violated the material requirements and were improperly inflated. The Designated Providers agreed not to notify the Contracting Officer, Program Manager, or anyone at TMA, that the government had been overpaying the Designated Providers for years. None of the Designated Providers requested instructions for disposition of the past overpayments. And none of the DPs remitted any overpayment amounts to TMA. Indeed, none of the Defendants so much as told TMA that the HSA Errors had been made in OP3 and earlier periods, so TMA could consider what to do.

**ii. The Plans Submitted False Claims**

323. By June 11, 2012, at the latest, the Designated Providers knew that the HSA Errors caused the OP3 ceiling rates to be improperly inflated. After this date, however, they continued to submit claims to TMA for payments at those improperly inflated OP3 rates. In other words, the DPs knowingly submitted claims to TMA after June 11, 2012 for payment at the OP3 rates even though the DPs knew those rates violated the material requirements.

324. Brighton Marine, via Steward, submitted invoices for payments at the improperly inflated OP3 rates on June 26, July 20, August 3, and October 3, 2012.

325. Christus submitted invoices for payments at the improperly inflated OP3 rates on or about June 12, on or about July 13, in August 2012, and on or about September 17, 2012.

326. Johns Hopkins submitted invoices for payments at the improperly inflated OP3 rates on June 28, July 23, September 18, and September 24, 2012. Along with each invoice,

Johns Hopkins submitted a letter in which its President certified that "to the best of my knowledge . . . the enclosed invoice is a true, fair, and accurate representation and is in accordance with contractual requirements."

327. Martin's Point submitted invoices for payments at the improperly inflated OP3 rates on June 14, July 12, August 10, and September 12, 2012.

328. PacMed submitted invoices for payments at the improperly inflated OP3 rates on or about July 19, August 15, and September 13, 2012. On each of these submitted invoices, PacMed certified that its invoice was "true and accurate and in accordance with contractual requirements."

329. St. Vincent's submitted invoices for payments at the improperly inflated OP3 rates on or about July 5, August 7, and September 7, 2012.

330. By submitting each invoice, the Designated Providers implicitly certified that the amounts they were seeking in payment complied with their USFHP Contract and all relevant terms therein, including the "terms and limitations contained in" the NDAA (including Section 726(b) and the actuarial soundness requirement) and Section 9.2.2.3.e, as well as the Federal Acquisition Regulation (FAR) provisions that were incorporated by reference.

331. Each Designated Provider knew these representations were false because they were aware that the ceiling rates calculated for OP3 violated the material requirements.

332. Each Designated Provider also submitted these invoices knowing that each invoice sought payment at an amount that was improperly inflated by the HSA Errors.

333. TMA paid each of the invoices described in paragraphs 324-329, *supra*.

## VI. CAUSES OF ACTION

**Count I: False Claims**
(False Claims Act, 31 U.S.C. § 3729(a)(1)(A))
(All Designated Providers)

334. The United States repeats and re-alleges paragraphs 1 through 333 above.

335. By virtue of the acts described above, after June 11, 2012, the Designated Providers knowingly presented, or caused to be presented, claims for payment or approval to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A); that is, the Designated Providers knowingly presented, or caused to be presented, to TMA invoices seeking payments based upon ceiling rates that the DPs knew were in excess of the limitation in Section 726(b), not actuarially sound, and/or in violation of Section 9.2.2.3.e of the USFHP Contracts regarding the health status adjustments.

336. Because of the foregoing, the United States suffered actual damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties.

337. The United States is also entitled to its costs prosecuting this litigation against Defendants, pursuant to 31 U.S.C. § 3729(a)(3).

**Count II: False Records or Statements**
(False Claims Act, 31 U.S.C. § 3729(a)(1)(B))
(All Defendants)

338. The United States repeats and re-alleges paragraphs 1 through 333 above.

339. By virtue of the acts described above, after June 11, 2012 Defendants knowingly made, used, or caused to be made or used, false records or false statements that were material to claims for payment or approval to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B); that is, Defendants knowingly made statements that were either express

falsehoods, contained misleading half-truths, and/or contained misleading omissions regarding the HSA Errors and past ceiling rates that concealed that the prior rates were in excess of the limitation in Section 726(b), not actuarially sound, and/or in violation of Section 9.2.2.3.e of the USFHP Contracts regarding the health status adjustments.

340. Those false statements include, but are not necessarily limited to, statements made: in the June 27 Milliman Memo forwarded to TMA on Defendants' behalf, *see* paragraphs 215-220, *supra*; in connection with the OP3 extension, *see* paragraphs 228-238, *supra*; in responses to TMA's letter dated September 10, which were approved by all Defendants, *see* paragraph 242, *supra*; and in Martin's Point and Christus' individual communications with TMA in the fall of 2012, *see* paragraphs 245-247, *supra*.

341. Because of the foregoing, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties.

342. The United States is also entitled to its costs prosecuting this litigation against Defendants, pursuant to 31 U.S.C. § 3729(a)(3).

**Count III: Reverse False Claims**
(False Claims Act, 31 U.S.C. § 3729(a)(1)(G))
(All Designated Providers)

343. The United States repeats and re-alleges paragraphs 1 through 333 above.

344. By virtue of the acts described above, for claims submitted prior to June 11, 2012 pursuant to the USFHP Contracts, the Designated Providers knowingly made or used a false record or statement material to an obligation to pay or transmit money to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), as the term "obligation" is defined in 31 U.S.C. § 3729(b)(3); that is, each Designated Provider knowingly made false statements

about the HSA Errors and past ceiling rates that concealed that the prior rates were in excess of the limitation in Section 726(b), not actuarially sound, and/or in violation of Section 9.2.2.3.e of the USFHP Contracts regarding the health status adjustments, which were material to the Designated Providers' obligation to repay TMA for the overpayments it received as a result of the HSA Errors—a repayment duty that arose from the NDAA, the Designated Provider's USFHP Contract (including the FAR provisions incorporated therein), and/or the Designated Provider's retention of the overpayment.

345. By virtue of the acts described above, for claims submitted prior to June 11, 2012 pursuant to the USFHP Contracts, the Designated Providers knowingly concealed and/or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G), as the term "obligation" is defined in 31 U.S.C. § 3729(b)(3); that is, each Designated Provider knowingly concealed and/or knowingly and improperly avoided its obligation to repay TMA for the overpayments it received as a result of the HSA Errors—a repayment duty that arose from the NDAA, the Designated Provider's USFHP Contract (including the FAR provisions incorporated therein), and/or the Designated Provider's retention of the overpayment.

346. Because of the Designated Providers' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties.

347. The United States is also entitled to its costs prosecuting this litigation against the Designated Providers, pursuant to 31 U.S.C. § 3729(a)(3).

**Count IV: FCA Conspiracy**
(False Claims Act, 31 U.S.C. § 3729(a)(1)(C))
(All Defendants)

348. The United States repeats and re-alleges paragraphs 1 through 333 above.

349. By virtue of the acts described above, Defendants conspired to violate the False Claims Act. Defendants reached an agreement to defraud the government and took at least one overt act in furtherance of that conspiracy.

350. Defendants reached an agreement to violate the False Claims Act by, *inter alia*, agreeing not to inform TMA that the HSA Errors had impacted the ceiling rates in OP3 and earlier periods and that those errors had caused the rates in OP3 and earlier periods to be improperly inflated.

351. The overt acts in furtherance of the conspiracy include, but are not necessarily limited to: agreeing to send, and sending, the June 27 Milliman Memo to TMA; *see* paragraphs 215-220, *supra*; failing to notify TMA at any point that it was extending improperly inflated rates, *see* paragraphs 228-238, *supra*; responding to TMA's letter dated September 10 and failing to alert it to the fact that there had been significant actuarial validity issues in applying the results of the CMS Model in the calculation of the ceiling rates in pervious option periods, *see* paragraph 242, *supra*; Martin's Point and Christus' statements to TMA in the fall of 2012, *see* paragraphs 245-247, *supra*, and continuing to submit invoices to TMA at improperly inflated rates, *see* paragraphs 323-329, *supra*.

352. Because of the Defendants' acts, the United States suffered damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties.

353. The United States is also entitled to its costs prosecuting this litigation against

Defendants, pursuant to 31 U.S.C. § 3729(a)(3).

**Count V: Breach of Contract**
(All Designated Providers)

354. The United States repeats and re-alleges paragraphs 1 through 333 above.

355. Each Designated Provider breached its USFHP Contract when it became aware that TMA had overpaid on one or more invoice payments and failed to immediately notify the Contracting Officer and request instructions for disposition of the overpayment, as required by 48 C.F.R. § 52.212-4(i)(5) (Feb. 2007) (which was incorporated into each USFHP Contract).

356. Each Designated Provider breached its USFHP Contract when it became aware that the ceiling rates had been calculated in violation of one or more of the material requirements and were improperly inflated, and it continued to submit invoices to TMA at those rates nevertheless.

357. Each Designated Provider is liable to the United States for the damages caused by its breach of contract.

**Count VI: Unjust Enrichment**
(All Designated Providers)

358. The United States repeats and re-alleges paragraphs 1 through 333 above.

359. This is a claim for the recovery of monies by which the Designated Providers have been unjustly enriched.

360. The USFHP Contracts between TMA and the Designated Providers, and the various contract modifications thereto, that memorialized ceilings rates for Base Period, OP1, OP2, and OP3 contained a mutual mistake and were each void *ab initio* or need to be reformed.

361. By obtaining government funds to which they were not entitled—i.e., the portions of the payments the DPs received in the Base Period, OP1, OP2, and OP3 that were in excess of

the payments they would have received had the ceiling rates for those periods complied with the material requirements—the Designated Providers were unjustly enriched and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

**Count VII: Payment by Mistake**
(All Designated Providers)

362. The United States repeats and re-alleges paragraphs 1 through 333 above.

363. This is a claim against the Designated Providers for the recovery of monies paid by the United States to the Designated Providers as a result of a mistaken understanding of fact.

364. The USFHP Contracts between TMA and the Designated Providers, and the various contract modifications thereto, that memorialized ceilings rates for Base Period, OP1, OP2, and OP3 contained a mutual mistake were each void *ab initio* or need to be reformed.

365. The invoices the Designated Providers submitted to TMA based on the Base Period, OP1, OP2, and OP3 ceiling rates, which violated the material requirements and were improperly inflated, were paid by the United States because of a mistaken understanding of a material fact.

366. The United States, acting in reasonable reliance on the Base Period, OP1, OP2, and OP3 ceiling rates being compliant with the material requirements and not being improperly inflated, paid the Designated Providers certain sums of money to which they were not entitled, and the Designated Providers are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

**PRAYER FOR RELIEF**

Wherefore, the United States demands and prays that judgment be entered in its favor on Counts I through VII as follows:

1) On the First and Third Counts, against the Designated Providers, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are permitted by law, as well as its costs pursuing this action, together with all such further relief as may be just and proper.

2) On the Second and Fourth Counts, against Defendants, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are permitted by law, as well as its costs pursuing this action, together with all such further relief as may be just and proper.

3) On the Fifth Count, against the Designated Providers, for breach of contract, for the amounts by which the United States was damaged by that breach, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

4) On the Sixth Count, against the Designated Providers, for unjust enrichment, for reformation of the contract, and/or for the amounts by which the Designated Providers were unjustly enriched, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

5) On the Seventh Count, against the Designated Providers, for payment by mistake, for reformation of the contract, and/or for the amounts the United States paid to the Designated Providers by mistake, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

Respectfully submitted

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

CRAIG M. WOLFF
Attorney for the United States
Acting under Authority Conferred by 28 U.S.C. § 515

/s/ Andrew K. Lizotte
Andrew K. Lizotte
Assistant U.S. Attorney
202 Harlow Street
Bangor, ME 04401
(207) 262-4636
Andrew.Lizotte@usdoj.gov

Sheila W. Sawyer
Assistant U.S. Attorney
100 Middle Street
East Tower, 6th Floor
Portland, Maine 04101
(207) 771-3246
Sheila.Sawyer@usdoj.gov

JAMIE ANN YAVELBERG
EDWARD CROOKE
DIANA K. CIESLAK
EVAN J. BALLAN
Attorneys, Civil Division
Commercial Litigation Branch
P.O. Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 353-1336