UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>ex rel. JANE ROLLINSON and<br>DANIEL GREGORIE,<br><br>      Plaintiff<br><br>v.<br><br>BRIGHTON MARINE, INC.,<br>CHRISTUS HEALTH, THE JOHNS<br>HOPKINS MEDICAL SERVICES<br>CORPORATION, MARTIN'S POINT<br>HEALTH CARE, INC., PACMED<br>CLINICS, SAINT VINCENTS<br>CATHOLIC MEDICAL CENTERS<br>OF NEW YORK, and US FAMILY<br>HEALTH PLAN ALLIANCE, LLC<br><br>      Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:16-cv-00447-LEW |

## ORDER ON MOTION TO DISMISS

In this action, the United States of America seeks to recover from the Defendants, a collection of healthcare providers, alleged overpayments made as the result of actuarial and computational errors on the part of a Department of Defense contractor. The matter is before the Court on the Defendants' Motion to Dismiss (ECF No. 139).

### BACKGROUND AND CLAIMS

In its review of a motion to dismiss, a court accepts as true all of the plaintiff's well-pleaded factual allegations, indulges reasonable inferences that arise from them, and views the resulting picture in the light most favorable to the plaintiff's cause. *Guilfoile v. Shields*,

913 F.3d 178, 186 (1st Cir. 2019). The following background statement observes these requirements.

The Department of Defense provides healthcare coverage to military families through various programs. One such program is the Uniformed Services Family Health Plan (USFHP). The Department of Defense delivers the healthcare services promised under the Plan through contracts with private providers. Each of the Defendants in this case is or was a Plan provider.

Under governing law and as provided in the contracts between the Department and the Defendants, it is unlawful for the Defendants to receive total reimbursements in excess of what the Department would otherwise pay if it delivered the Plan's benefits by means of another program, such as TRICARE or Medicare.[1]

The parties agreed[2] to calculate Plan reimbursement rates by means of a capitation payment, meaning a set amount for each enrolled beneficiary. Determination of the proper capitation amount is a function of a computational process that relies on certain actuarial data and methodologies and the computational inputs vary according to the age of the beneficiary and the regional market. Between 2008 and 2012, the Department's actuarial

---

[1] *See* 110 Stat. 2422, § 726(b):

> (b) LIMITATION ON TOTAL PAYMENTS.—Total capitation payments for health care services to a designated provider shall not exceed an amount equal to the cost that would have been incurred by the Government if the enrollees had received such health care services through a military treatment facility, the TRICARE program, or the Medicare program, as the case may be.

[2] For its part, the Department of Defense relied on the services of an agent to oversee the Plan. That agent was known as the TRICARE Management Activity or TMA. In turn, the TMA relied on an actuarial service provider to represent its interest in connection with agreed upon actuarial approaches to rate setting under the Program.

agent, Kennell & Associates, used the wrong actuarial data sets and methodologies when calculating capitation rates, producing rates in excess of what should have been produced for beneficiaries age 65 and older. As a result, during this time, Defendants experienced and were aware of unusually high profit margins from their delivery of services under the Plan.

In 2012, while negotiating rates for a new annual contract period, the Defendants learned that the Plan was so profitable due to Kennell's actuarial errors in connection with capitation rates for beneficiaries aged 65 and older. Instead of informing the Department of the overpayments, the Defendants allegedly met and collectively decided that they would modify their approach to negotiating capitation rates by advocating the use of a different computational methodology that would avoid tipping off the Department that the Defendants had received significant overpayments in the preceding years. This new approach produced a prolonged negotiation period, during which the Defendants accepted an extension of the last, erroneous capitation reimbursement rate without informing the Department of the ongoing overpayments. The Defendants' approach to the negotiation process was successful in terms of avoiding disclosure of the historic overpayments.[3]

During the negotiations, the Department expressed the understanding that, to its knowledge, there had been no significant actuarial validity issues in prior years, making this statement in the context of a list of understandings. In a responsive letter, sent after

---

[3] Kennell also learned of its errors and like Defendants did not notify the Department. According to the Intervenor Complaint's allegations, Kennell & Associates has since entered into a settlement agreement with the Department "in an amount that, according to a qualified expert, is likely the maximum Kennell has the ability to pay." Compl. ¶ 290.

review by all of the Defendants, the Defendants crafted an obfuscatory responsive comment, effectively intentionally continuing to buffalo the Department to avoid the disclosure of past overpayments.

Certain of the Defendants, namely Martin's Point and Christus, continued to advocate for a continuation of the earlier methodology, despite knowing that it would yield unsound and unjustified overpayments. Martin's Point went so far as to argue, falsely, that the old rate should continue because it would assure that the capitation rate would be the product of an actuarially sound methodology. Christus made similarly misleading statements in its bid to maintain the prior approach to capitation calculations.

Throughout the 2012 negotiation process, the Defendants realized from communications made by the Department's representative, the TRICARE Management Activity, that the Department continued to be unaware of the past errors and that Kennell & Associates had not provided any notice of their errors. Had the Department learned of the errors, it would have discontinued all reimbursement based on erroneous capitation rates and would have sought to recover the "hundreds of millions" of dollars in overpayments. Intervenor Compl. ¶ 289.

In 2016, following the filing of the relators' *qui tam* complaint, the Department first learned of the overpayments.

In its Intervenor Complaint, the United States alleges that the errors in the capitation calculations caused the Department's payments to the Defendants to exceed the statutory limit and to violate the actuarial soundness requirement and the health status adjustment comparison requirement of the contracts.

### FCA Claims

In Count I of the Intervenor Complaint (ECF No. 88), the United States cites 31 U.S.C. § 3729(a)(1)(A) of the False Claims Act (FCA) and seeks damages for the Defendants' knowing presentation of false claims after June 11, 2012.

In Count II, the United States cites 31 U.S.C. § 3729(a)(1)(B) of the FCA and seeks damages for the Defendants' knowing use of false records and/or statements in support of claims for payment, in connection with claims made after June 11, 2012. The United States itemizes the presentation dates for specific records and statements.

In Count III, the United States cites 31 U.S.C. § 3729(a)(1)(G) and seeks damages for "reverse false claims" consisting of knowingly making or using false records or statements to avoid an obligation to pay money back to the United States that Defendants were not entitled to and should never have received.

In Count IV, the United States cites 31 U.S.C. § 3729(a)(1)(C) and seeks damages based on the Defendants' conspiracy to defraud the United States by agreeing not to disclose the known overpayments and taking overt acts to keep the Department in the dark.

### Common Law Claims

In Count V, the United States seeks damages based on the Defendants' breach of their respective contracts, which required the Defendants to notify the Department and request instructions for disposition of the overpayments in accordance with 48 C.F.R. § 52.212-4(i)(5) (Feb. 2007).

In Count VI, the United States seeks an equitable recovery based on unjust enrichment.

Finally, in Count VII, the United States seeks a recovery based on the parties' mutual mistake of fact.

### THE DISMISSAL STANDARD

Defendants seek dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Pursuant to this Rule, a defendant may move for dismissal based on the contention that the plaintiff has failed to state a claim for which relief may be granted. Fed. R. Civ. P. 12(b)(6). In its review of a motion to dismiss, a court accepts as true all of the plaintiff's well-pleaded factual allegations, indulges reasonable inferences that arise from them, and views the resulting picture in the light most favorable to the plaintiff's cause. *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019). To overcome the motion to dismiss, the plaintiff's factual allegations, so construed, must depict a plausible basis, as opposed to a merely conceivable basis, for concluding that each material element of its claim(s) can be established. *Id.*

The Rule 12 dismissal standard is informed by pleadings standards found in Rule 8 and Rule 9. Rule 8 states that a pleading party need only provide a "short and plain statement of the claim showing that [it] is entitled to relief." Fed. R. Civ. P. 8(a). However, Rule 9 provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," although conditions of mind such as knowledge may be alleged generally. Fed. R. Civ. P. 9(b). The particularity requirement of Rule 9 has relevance when it comes to pleading a false claim. *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 227 (1st Cir. 2004). Generally, this means that allegations about false claims must be particularized with "time, place, and content"

information so that the defendant has notice of the claim and its reputation is protected against meritless claims of fraud. *Id.* at 226. *See also id.* at 228 ("[T]he details of the actual presentation of false or fraudulent claims to the government can and must be pled with particularity in order to meet the requirements of Rule 9(b).").

## DISCUSSION

The Defendants raise challenges to each of the United States' claims. Much of Defendants' approach is framed by the argument that the claims are nothing more than turtles all the way down; inference stacked upon airy inference, lacking a tap root to a well-pleaded fact. Alternatively, Defendants appear to ask me to declare, at the pleading stage, that their allegedly rational alternative inferences are more convincing than those of the United States. I do not see this as a case of the pleading version of infinite regress and I categorically reject any invitation for me to rank order on the plausibility scale the competing inferences offered by the parties. So long as there are well pleaded facts and attendant reasonable inferences to support the claims in the first instance, competing alternative facts and inferences will have to wait their turn for a fact finder to resolve.

More particularly, Defendants argue that the United States has failed to allege overpayment, failed to allege scienter, and failed to allege a conspiracy in support of their FCA claims. Concerning the common law claims, the Defendants argue that the United States failed to allege breach of a contract term and that the remaining claims are unavailable to the United States because the relationship was subject to a contract. Finally, the Defendants contend that there can be no payment by mistake claim because the parties negotiated the rates that were paid. I find the Defendants' arguments unconvincing.

A.    **FCA Claims**

The False Claims Act imposes liability on persons who, among other things, knowingly present to the United States false or fraudulent claims for payment; knowingly make, use, or cause to be made or used false records or statements material to a false or fraudulent claim; knowingly made, used, or caused to be made or used false records or statements material to an obligation to pay the United States money; knowingly conceal, avoid, or decrease such an obligation; or conspire to commit any of these acts. *See* 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G). The so-called "reverse false claim" provision found in subsection (a)(1)(G) applies to efforts to avoid an obligation to repay money to the government. An "obligation" is defined to include "an established duty, whether or not fixed, arising from an express or implied contractual . . . relationship, . . . from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3).

The FCA defines the term "knowingly" to encompass three mental states, sometimes referred to as scienter, a Latinism that refers to a culpable state of mind. The three culpable mental states are "actual knowledge," "deliberate ignorance," and "reckless disregard" of wrongdoing. *Id.* § 3729(b)(1)(A)(i)–(iii). Proof of one or more of these states of mind at the time the defendant acted is a critical element of a false claim. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 752 (2023).

"[T]he term 'deliberate ignorance' encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.* at 751. "[T]he term 'reckless disregard'

8

similarly captures defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *Id.*

### 1. *The allegation of overpayment is plausible and sufficiently particularized.*

The Defendants argue that a reasonable person who reviewed the allegations would find it *implausible* that the Defendants were ever overpaid. Mot. at 15-28. In particular, they observe that the Intervenor Complaint does not specify the expenditure limit produced by the National Defense Authorization Act[4], or by how much it was exceeded by each of the Defendants. In their view, the heightened pleading standard of Rule 9 would be violated unless the United States first determines and alleges with specificity "the actual cost of care that would have been incurred if the USFHP beneficiaries had received [their] care through other government health care programs." Mot. at 18. They maintain that their negotiated rates were not meant to equal the limit and they suppose that they may have been paid just as much even if the errors that informed the 65-and-older capitation rate had been caught at the inception, because they might have negotiated higher rates for other beneficiaries. Mot. at 18-21.

In other words, the Defendants basically ignore that all reasonable inferences must be drawn in favor of the United States at this stage of the proceedings. As alleged, the parties meant for the capitation rates to calculate the cost of care that would have arisen through other government programs, the so-called ceiling rate. Their ceiling rate

---

[4] The USFHP is authorized and governed by the National Defense Authorization Act for Fiscal Year 1997, Pub. L. No. 104-201 § 721 et seq., 110 Stat. 2422 (1996), as amended, reprinted in the notes of 10 U.S.C. § 1073. Intervenor Compl. ¶ 31. Section 726 of the NDAA concerns "Payments for Services" for Uniformed Services Treatment Facilities.

9

"negotiations" were actuarial in nature and the parties mistakenly understood that the agreed upon rates had a solid actuarial basis and were therefore a reliable indicator of the ceiling payment permitted to each Defendant by the National Defense Authorization Act (NDAA). By logical extension, errors that inflated the rate plausibly would produce an overpayment in violation of the NDAA. Furthermore, contrary to the Defendants' contention, it is in fact plausible that the Government might agree to pay contractors the maximum amount allowed by governing law through a "negotiation" process.

The actuarial quality of the capitation rate also provides the Defendants with sufficient time, place, and content notice for Rule 9 purposes, since the allegations state with particularity the time period of and the circumstances constituting the mistakes (and the later, alleged fraud). I also agree with the United States that requiring it to insert into the Intervenor Complaint an itemization of damages produced by the Kennell & Associates' mistakes would be overkill and would effectively exalt a hyper technical approach to false claims pleadings notwithstanding the provision of ample notice of not only when and why the repayment obligation arose, but how it can be calculated.

The Defendants next argue that the alleged lack of actuarial soundness is itself implausible and overstated. Mot. at 21-23. As alleged, the Defendants fully appreciated as of 2012 that Kennell & Associates had made significant errors that had resulted in dramatic overpayments since 2008. Why the Defendants would characterize as implausible something they had meetings to discuss and allegedly strategized to keep quiet is a mystery. The absence of an actuarially sound approach to the capitation rate is perfectly plausible.

Next, the Defendants contend that their contracts ensured them fixed rates, so they could not have been overpaid. Mot. at 23-27. The allegations, however, divulge a plausible basis to infer that the parties agreed and understood that for the Department to pay a capitation rate for the 65-and-over beneficiaries it would first need to be "fixed" by an actuarially sound methodology. As alleged, the parties agreed that the Defendants would be paid according to a particular "ceiling" rate-setting methodology. Obviously, the erroneous application of the methodology by Kennell & Associates would not have been within the parties' mutual contemplation. A rate fixed by mutual error or misunderstanding is not fixed. Nor could it be fixed if it is in violation of federal law. But even if it would otherwise be reasonable to assign the risk of loss to the Department based on the actuarial errors of its agent[5], in any event the TRICARE Management Activity that contracted on behalf of the Department lacked the authority to agree to payments in excess of the limitation established by the NDAA. It is generally understood that contractors who enter agreements with officers of the government bear the risk that the officers may be acting beyond the bounds of their authority. *Liberty Ammunition, Inc. v. United States*, 835 F.3d 1388, 1401 (Fed. Cir. 2016); *CACI, Inc. v. Stone*, 990 F.2d 1233, 1236 (Fed. Cir. 1993). *See also United Launch Servs., LLC v. United States*, 139 Fed. Cl. 664, 682 (2018) ("It is well established that contracting officers lack the authority to bind the government to

---

[5] This is a consideration that cannot be determined mechanically in the context of a motion to dismiss. The imputation of knowledge from an agent to a principal is not automatic, especially where the other party knows that the agent has acted adversely to the principal. Restatement (Third) Of Agency § 5.04 (2006).

11

contractual payment provisions that are contrary to statute or regulation (including the FAR), and that such provisions are therefore not enforceable.") (colleting cases).[6]

Furthermore, a review of the contracts indicates that the parties agreed that the relevant rate of compensation for enrollees age 65 and over would be a function of the health status adjustment, Contract § 9.2.2.3(e), to ensure compliance with the NDAA, *see* n.4, *supra*.[7]  If the health status adjustment was not properly applied and produced excessive compensation, it was contrary to the parties' mutual expectation.

Next, the Defendants argue that the alleged obligation to repay cannot plausibly be inferred because the Federal Acquisition Regulations (FAR) that were incorporated into the contracts do not require it, citing 48 C.F.R. § 52.212-4 (Contract Terms and Conditions—Commercial Products and Commercial Services).  Mot. at 27-28.  The relevant portion of the cited regulation provides:

---

[6] As its counterpoint to this precedent, the Defendants cite opinions involving efforts by contractors or sureties to void government contracts based on the government's failure to comply with federal authorization/preauthorization law.  My understanding of these opinions is that a contractor will not be heard on a claim seeking to void a fixed price contract because it turned out that the costs of the project's completion were greater than the price fixed in its contract with the government.  *See, e.g.*, *United Pac. Ins. Co. v. United States*, 464 F.3d 1325 (Fed. Cir. 2006).  Nor can the government stiff a contractor by voiding its obligation to pay a fixed price contract based on the lack of proper authorization.  *Id.* (discussing *United States v. Amdahl*, 786 F.2d 387 (Fed. Cir. 1986)).  The instant case does not involve an attempt to evade a fiscally injurious contract by attempting to void it, but rather to ensure that the compensation paid to the contractor conformed to the mutual expectations of the parties.

[7] The Health Status Adjustment provision states:

> The Government will compare the health status of the DP enrollees age 65 and over with the health status of the 65 and over Medicare beneficiaries in the DP's service area.  The Government will use Medicare's method of measuring health status unless the DP and the Government mutually agree to use a more appropriate method to measure health status.  This health status adjustment will be used to adjust the ceiling rates for the 65 and over population.

PageID # 686.

(5) Overpayments.  If the Contractor becomes aware of a duplicate contract financing or invoice payment or *that the Government has otherwise overpaid on a contract* financing or *invoice payment*, the Contractor shall—

(i) Remit the overpayment amount to the payment office cited in the contract along with a description of the overpayment including the—

(A) Circumstances of the overpayment (e.g., duplicate payment, erroneous payment, liquidation errors, date(s) of overpayment);
(B) Affected contract number and delivery order number, if applicable;
(C) Affected line item or subline item, if applicable; and
(D) Contractor point of contact.

(ii) Provide a copy of the remittance and supporting documentation to the Contracting Officer.

48 C.F.R. § 52.212-4(i)(5) (emphasis added).

The Defendants state that the regulation is "plainly inapplicable" because it establishes a payment return procedure and not a contract adjustment procedure and they complain, again, that the pleadings do not itemize invoices from all of the Defendants. Mot. at 27.  Based on my own reading, there is no evident justification for this argument. Even if the regulation is mere window dressing, something I do not resolve at present, that would not end the case for the reasons already discussed.  Basic contract principles associated with mutual mistake would appear to serve adequately to sustain the claims. The Defendants' argument also disregards the parties' prior history of agreeing to adjustments when they learned of other errors.

### 2. *The allegations of knowing conduct and conspiracy are plausible.*

The Defendants argue that the allegations, accepted as true, cannot support a finding that they knew they had been overpaid, that they knew Kennell would not disclose its errors

13

to the Department, that they would have understood that the errors impacted payments since 2008, or that they conspired to prevent disclosure to the Department. Mot. at 28-39.

The Defendants continue to review the pleadings blinkered, as though inferences are to be drawn in their favor rather than in favor of the United States. The Government's allegations provide ample cause to support the necessary inference of the Defendants' knowledge, including a description of particularized communications among the Defendants indicating that they understood that the errors impacted the entire relevant period and that they contemplated that the overpayments could be recoverable and thereafter took an approach to rate negotiations that was designed to prevent the Department from learning of Kennell & Associates' actuarial errors. Furthermore, as alleged, the Defendants and their own actuarial agent were themselves in a good position to draw the inference that Kennell & Associates had not disclosed their multi-million-dollar errors to the Department.

The Defendants also argue that the allegations will not support a plausible inference that they conspired. While the conspiracy allegations in a FCA claim are subject to the particularity requirement of Rule 9(b), *U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 45 (1st Cir. 2009), this argument is likewise overcome by particularized allegations pertaining to the Defendants' own deliberations and nondisclosure. Discovery may eventually tell a different story, but in terms of the plausibility of such a scenario involving government contracts, it is plausible that that was what happened.[8]

---

[8] To the extent some of the Defendants want to introduce an advice of counsel defense, a motion to dismiss is not the proper context for that kind of argument. That defense lies entirely outside the scope of my review

Finally, the Defendants argue that the FCA claims should not reach the US FAMILY HEALTH PLAN ALLIANCE, LLC, the entity through which the other Defendants collaborated in relation to their approach to contract negotiations with the Department. Mot. at 39-40. Once again, the Intervenor Complaint contains sufficient facts to support the necessary findings. Indeed, the conspiracy claim is largely built on communications relayed among the Defendants through Family Health Plan Alliance and its counsel.

**B.      Common Law Claims**

Defendants' challenges to the common law claims deserve comment only insofar as they raise the existing contracts as obstacles to recovery on a quasi-contract basis. In all other respects their salvos are readily deflected in the Response of the United States (ECF No. 150).

This controversy concerns the parties' mutual expectations related to the actuarial soundness of the capitation rates, and consequently their dispute is animated by their contractual undertakings. "In general, a plaintiff cannot maintain a [quasi contract] claim concerning an aspect of the parties' relationship that was governed by a contract." *Smith v. Rubicon Advisors*, *LLC*, 254 F. Supp. 3d 245, 249–50 (D.D.C. 2017) (citing *In re APA Assessment Fee Litig.*, 766 F.3d 39, 46 (D.C. Cir. 2014)). On the other hand, in the FCA context, courts appear to recognize an exception to the incompatibility of contract and quasi-contract claims when the dispute arises out of alleged price-related falsehoods. *See,*

---

of the pleadings. *Kia Am., Inc. v. DMO Auto Acquisitions, LLC*, --- F. Supp. 3d ---, 2025 WL 968786, at *2 (D.N.H. Mar. 31, 2025).

15

*e.g.*, *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 114 (D.D.C. 2017). Furthermore, given that the contract claim involves an alleged mutual mistake and raises contract reformation concerns, this otherwise primary-color contract dispute is already steeped in overtones of equity. *E.g.*, *Philippine Sugar Estates Dev. Co. v. Gov't of Philippine Islands*, 247 U.S. 385, 389 (1918) ("It is well settled that courts of equity will reform a written contract where, owing to mutual mistake, the language used therein did not fully or accurately express the agreement and intention of the parties."). Consequently, in a case like this one, the most practical approach at the pleading stage is to defer dismissal of the quasi-contract claims while acknowledging that the plaintiff will in no event be permitted to recover damages based on inconsistent theories.

## CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 139) is DENIED.

SO ORDERED.

Dated this 2nd day of June, 2025.

/s/ Lance E. Walker
Chief U.S. District Judge